UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RONALD HENRY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MARLETTE FUNDING, LLC d/b/a BEST EGG,<br><br>Defendant. | Case No. 2:21-cv-00985<br><br>CLASS ACTION |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Ronald Henry ("Plaintiff" or "Henry"), individually and on behalf of all others similarly situated, brings this action against Marlette Funding, LLC ("Defendant" or "Best Egg"), and alleges as follows:

### NATURE OF THE ACTION

1. This action seeks damages, attorneys' fees, and costs against Best Egg for its violations of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL").

### PARTIES

2. Henry is a person residing in Westmoreland County, Pennsylvania.

3. Best Egg is a limited liability company headquartered in Wilmington, Delaware.

4. Best Egg claims to be a top five leader in online lending.

5. Best Egg makes unsecured personal loans to consumers in the United States.

### PENNSYLVANIA'S CONSUMER FINANCE LAWS

6. The Consumer Discount Company Act ("CDCA") regulates personal loans in Pennsylvania. 7 P.S. §§ 6201-6219.

7. The CDCA prohibits non-banks from charging, collecting, contracting for, or receiving interest and fees that aggregate above the interest a non-bank can charge without a CDCA license. 7 P.S. § 6203.A.

8. The Loan Interest and Protection Law ("LIPL") limits non-banks to charging no more than 6% simple interest per year. 41 P.S. § 201(a).

9. Because of the LIPL's 6% interest rate cap, the CDCA caps non-banks that are not otherwise authorized to exceed the LIPL's 6% interest rate cap to charging, collecting, contracting for, or receiving interest and fees that aggregate to no more than 6% simple interest per year. 7 P.S. § 6203.A.

10. Once a non-bank obtains a CDCA license, it is limited to charging, collecting, contracting for, or receiving the interest and fees allowed by the CDCA. 7 P.S. § 6214.B.

11. For pre-computed loans, non-banks can pre-compute interest at a rate that varies between around 25% and 28% simple interest per year (depending on the length of the loan) and a service charge up to $150.00. 7 P.S. § 6213.E, F.

12. For simple interest loans, non-banks can charge interest at a rate of 24% and annual fees up to $50.00. 7 P.S. § 6217.1.A, D.

**FACTUAL ALLEGATIONS**

*Best Egg's Lending Practices*

13. Best Egg operates a lending platform at bestegg.com, through which Best Egg accepts loan applications.

14. After Best Egg evaluates a consumer's creditworthiness and makes a loan offer, Best Egg requests that Cross River Bank ("Cross River") issue the loan.

15. Two days after it issues the loan, Cross River sells the loan back to Best Egg or Best Egg's non-bank designees without recourse.

16. The loans are simple interest loans.

17. Most (if not all) of the loans are high interest, with interest rates reaching up to 36% simple interest per year.

18. The loans also include an origination fee, which generally is a percentage of a loan's principal balance.

19. The loan origination fees often are in the hundreds to thousands of dollars.

20. When consumers default on a loan, Best Egg or Best Egg's non-bank designees sell their loan for pennies on the dollar to various debt buyers.

21. Afterward, the debt buyers attempt to collect the full balance of the loans from consumers.

*Facts Relevant to Henry*

22. In October of 2015, Cross River issued a personal loan to Henry (the "Account").

23. Two days later, Cross River allegedly sold the loan to one of Best Egg's non-bank designees.

24. The name of the designee was "Marlette Funding Consumer Loan Trust."

25. The loan was used for personal, family, and/or household purposes.

26. The loan was issued in the amount of $8,000.00.

27. Yet Henry only received $7,600.80 of actual money because Best Egg charged and deducted a $399.20 "origination fee."

28. Interest was also charged on the loan at a rate of 17.30%.

29. The interest and origination fee yielded an annual percentage rate of over 21%.

30. Henry made $4,299.16 in payments on the loan.

31. $2,307.69 of these payments went to principal and $1,680.60 of these payments went to interest and fees.

32. These payments amounted to 57% of the money Henry received.

33. At a certain point, Henry could no longer repay the loan and the loan was charged-off.

34. Despite paying 57% of the money Henry received from the loan, and because of the high interest rate and origination fee, Henry still owed $5,913.52 on the loan (or 78% of the money Henry received) when the loan was charged-off.

35. After the loan was charged-off, Marlette Funding Consumer Loan Trust allegedly sold the loan to a debt buyer called UHG I LLC ("UHG").

36. To the extent UHG actually bought the loan, it did so for pennies on the dollar of the unpaid balance.

37. After buying the loan for pennies on the dollar, UHG began contacting Henry and demanding payment of the entire $5,913.52.

***Best Egg's Actions are Unlawful***

38. Best Egg and its non-bank designees are non-banks without CDCA licenses.

39. Accordingly, Best Egg is not authorized under any law to charge interest above the LIPL's 6% interest rate cap on any loan for which Best Egg seeks to charge interest on behalf of itself or its non-bank designees. 41 P.S. § 201(a).

40. This means the CDCA prohibits Best Egg from charging, collecting, contracting for, or receiving interest and fees that aggregate in excess of 6% simple interest per year. 7 P.S. § 6203.A.

41. Yet Best Egg routinely issues loans with interest and fees that aggregate in excess of 6% simple interest per year, and charges, collects, contracts for, or receives such interest and fees from Pennsylvania consumers.

42. Best Egg cannot charge, collect, contract for, or receive most of the interest and fees it charges, collects, contracts for, or receives because Best Egg and its non-bank designees do not have and have never had the license to do so.

43. Best Egg partners with Cross River in an attempt to circumvent the CDCA and the LIPL, but this partnership does not make Best Egg's loans lawful.

44. Although banks like Cross River may lawfully charge interest and fees at the rates and amounts charged on Best Egg's loans, Best Egg cannot take advantage of the rights granted to banks once a loan is sold. *See, e.g.*, *Madden v. Midland Funding, LLC*, 786 F.3d 246, 250 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2505 (2016).

45. Regardless, Cross River is not the true lender of the loans at issue, meaning the loans are not made by a bank and the interest and fees charged on Best Egg's loans are never lawful. *See, e.g., Fulford v. Marlette Funding, LLC*, No. 17-cv-30376 (Colo. Dist. Ct. Denver Cty.); *Fulford v. Avant of Colo., LLC*, No. 17-cv-30377 (Colo. Dist. Ct. Denver Cty.); *Cmty. State Bank v. Strong*, 651 F.3d 1241 (11th Cir. 2011); *Easter v. Am. W. Fin.*, 381 F.3d 948 (9th Cir. 2004); *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No. 15-cv-7522, 2016 U.S. Dist. LEXIS 130584 (C.D. Cal. Aug. 31, 2016); *Pennsylvania v. Think Fin., Inc.*, No. 14-cv-7139, 2016 U.S. Dist. LEXIS 4649 (E.D. Pa. Jan. 14, 2016); *Goleta Nat'l Bank v. Lingerfelt*, 211 F. Supp. 2d 711 (E.D.N.C. 2002); *CashCall, Inc. v. Morrisey*, No. 12-cv-1274, 2014 W. Va. LEXIS 587 (W. Va. May 30, 2014); *Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190 (N.D. Cal. 2012); *Eul v. Transworld Sys.*, No. 15-cv-7755, 2017 U.S. Dist. LEXIS 47505 (N.D. Ill. Mar. 30, 2017).

46. The Best Egg/Cross River partnership is a subterfuge to evade Pennsylvania law.

47. Pennsylvania courts have long held that circumvention of Pennsylvania's usury laws is unlawful and will not be allowed. *See Simpson v. Penn Disc. Corp.*, 5 A.2d 796, 798 (Pa. 1939); *Saunders v. Resnick*, 16 A.2d 676, 678 (Pa. Super. 1940); *Moll v. Lafferty*, 153 A. 557, 558-59 (Pa. 1931); *Walnut Disc. Co. v. Weiss*, 208 A.2d 26 (Pa. Super. 1965); *see also Scott v. Lloyd*, 34 U.S. 418 (1835); *Mo., Kan. & Tex. Trust Co. v. Krumseig*, 172 U.S. 351, 355-56 (1899).

***Best Egg's Actions Cause Substantial Harm to Pennsylvania Consumers***

48. Best Egg's actions make loans more expensive, increase the risk of default, and make the consequences of default much worse.

49. First, by charging, collecting, contracting for, or receiving interest and fees it cannot charge, collect, contract for, or receive, Best Egg makes loans more costly.

50. For example, Henry paid thousands more than he otherwise would have had to pay had Best Egg charged interest and fees at the lawful rates and amounts.

51. Second, by charging, collecting, contracting for, or receiving interest and fees it cannot charge, collect, contract for, or receive, Best Egg makes default more likely.

52. For example, because of Best Egg's unlawful interest and fees, Henry's payments were close to $300 per month.

53. Had Best Egg charged interest and fees at the legal rate and in the legal amount, Henry's monthly payments would have been much less, making it easier for Henry to repay the loan and decreasing the chance Henry would default.

54. Third, by charging, collecting, contracting for, or receiving interest and fees it cannot charge, collect, contract for, or receive, Best Egg makes the consequences of default much worse.

55. For example, because of the unlawful interest and fees charged when the Account was active, Henry's payments went to unlawful interest and fees, rather than paying down the amount Henry actually received on the loan.

56. So, when Henry defaulted, he owed substantially more than he otherwise would have owed had Best Egg charged interest and fees at lawful rates and amounts.

57. Similarly, because of the unlawful interest and fees that continued to accumulate on the Account when the Account was in default, Henry owed more than he otherwise would have owed had Best Egg charged interest and fees at lawful rates and amounts.

58. Best Egg's actions caused and continue to cause substantial harm to Pennsylvania consumers by making their loans more costly, increasing their chances of default, and making the consequences of default far worse.

59. Henry brings this action seeking redress for the harm Best Egg's actions caused.

## CLASS ACTION ALLEGATIONS

60. Plaintiff brings this action individually and on behalf of all others similarly situated under Rules 1702, 1708, and 1709 of the Pennsylvania Rules of Civil Procedure.

61. Plaintiff seeks to certify the following class: "All persons who, within the applicable statute of limitations, were issued a Best Egg loan and paid interest and fees that aggregated in excess of 6% simple interest per year."

62. Plaintiff reserves the right to expand, narrow, or otherwise modify the class as litigation continues and discovery proceeds.

63. <u>Numerosity and Ascertainability:</u> The class is so numerous that joinder of the class members is impracticable. According to Best Egg, there are thousands of class members. The class members can be ascertained by reviewing records held by Best Egg.

64. <u>Commonality and Predominance:</u> Plaintiff and the class members share numerous common questions of law and fact that will drive the resolution of the litigation and predominate over any individual issues. For example, there is a single common answer to the question of whether Best Egg could charge, collect, contract for, or receive interest and fees that aggregate in excess of the rates and amounts set forth in the LIPL or the CDCA. This question, and other common questions of law and fact, predominate over any individual issues.

65. <u>Typicality:</u> Plaintiff's claims are typical of the claims of the class because their claims are based on the same legal theories and arise from the same conduct.

66. <u>Adequacy:</u> Plaintiff is an adequate representative of the class because the interests of Plaintiff and the class members align. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the class and has no interest antagonistic to the class. Plaintiff retained counsel who are competent and experienced in the prosecution of class action litigation generally and consumer finance litigation specifically.

67. <u>Superiority:</u> Given the complexity and nature of the issues presented and the relief requested, the expense and time necessary to obtain such relief, and the anticipated recovery and relief Plaintiff and the class members may obtain, the class action mechanism is by far the preferred and most efficient litigation mechanism to adjudicate the claims of Plaintiff and the class members. Additionally, requiring Plaintiff and the class members to file individual actions would impose a crushing burden on the court system and almost certainly lead to inconsistent judgments. Class treatment presents far fewer management difficulties and provides benefits of a single adjudication and economies of scale. Since each of the claims of the class members is substantially identical, and the class members request substantially similar relief, centralizing the class members' claims in a single proceeding likely is the most manageable litigation method available.

## COUNT I
### Violation of the Unfair Trade Practices and Consumer Protection Law
### 73 P.S. §§ 201, *et seq.*

68. This claim is brought individually and on behalf of the class.

69. Plaintiff and Defendant are persons, the Account was used to buy goods and services for personal, family, and/or household use, and Defendant's conduct described herein is trade or commerce under the UTPCPL. 73 P.S. §§ 201-2(2)-(3), 201-9.2.

70. Defendant's conduct described herein constitutes unfair methods of competition and unfair or deceptive acts or practices under the UTPCPL because Defendant engaged in fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding. 73 P.S. § 201-2(4)(xxi).

71. Defendant's use of unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce violates 73 P.S. § 201-3.

72. Henry and the class members lost money or property as a result of Defendant's violations and therefore are entitled to actual damages, statutory damages, treble damages, and all other available relief under 73 P.S. 201-9.2, as well as reasonable costs and attorneys' fees, and such additional relief the Court deems necessary and proper.

### JURY TRIAL DEMANDED

Plaintiff requests a jury trial on all claims so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

a. An order certifying the proposed class, appointing Plaintiff as representative of the proposed class, and appointing undersigned counsel as counsel for the proposed class;

b. An order awarding actual, statutory, treble, and all other damages available by law, along with pre- and post-judgment interest;

c. An order awarding attorneys' fees and costs;

d. An order declaring Defendant's conduct unlawful; and

e. An order awarding all other relief that is just, equitable, and appropriate.

Respectfully submitted,

Dated: August 16, 2021

By: */s/ Kevin Abramowicz*
Kevin Abramowicz
Kevin W. Tucker
Chandler Steiger
Stephanie Moore
East End Trial Group LLC
6901 Lynn Way, Suite 215
Pittsburgh, PA 15208
Tel: (412) 223-5740
Fax: (412) 626-7101
kabramowicz@eastendtrialgroup.com
ktucker@eastendtrialgroup.com
csteiger@eastendtrialgroup.com
smoore@eastendtrialgroup.com

*Attorneys for Plaintiff*

### CERTIFICATE OF SERVICE

I hereby certify that, on August 16, 2021, a true and correct copy of this First Amended Class Action Complaint was served on the following counsel of record by electronic means via the Court's CM/ECF system:

Justin J. Kontul
Alex Mahfood
Reed Smith LLP
225 Fifth Avenue
Pittsburgh, PA 15222
jkontul@reedsmith.com
amahfood@reedsmith.com

*/s/ Kevin Abramowicz*
Kevin Abramowicz