**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RONALD HENRY, individually and on behalf of all others similarly situated, | Civil Action No. 2:21-cv-00985-RJC |
| Plaintiff, | |
| v. | |
| MARLETTE FUNDING, LLC d/b/a BEST EGG, | |
| Defendant. | |

**DEFENDANT MARLETTE FUNDING, LLC d/b/a BEST EGG'S
CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF
THIRD MOTION TO COMPEL INDIVIDUAL ARBITRATION**

Pursuant to Local Rule LCvR 56 of the Local Rules for the United States District Court for the Western District of Pennsylvania, Defendant Marlette Funding, LLC d/b/a Best Egg ("Defendant" or "Marlette") submits this Concise Statement of Material Facts in Support of Third Motion to Compel Individual Arbitration ("Motion") and in support states as follows.

***Factual Allegations in the FAC***

1.     Marlette operates an online lending platform through which it accepts loan applications.  *See* Dkt. 11 ¶ 13.

2.     Plaintiff Ronald Henry ("Plaintiff" or "Henry") alleges that after Marlette makes a loan offer, it requests that Cross River Bank ("CRB") issue the loan.  *Id.* ¶ 14.

3.     After CRB issues the loan, CRB sells the loan to Marlette or a "designee."  *Id.* ¶ 15.

4.     Plaintiff was issued an $8,000 "Best Egg" loan for personal, family, and/or household purposes in October of 2015.  *Id.* ¶¶ 22, 25-26.

5.    Two (2) days later, CRB sold the loan to one of Marlette's "designees," Marlette Funding Consumer Loan Trust. *Id.* ¶ 23.

6.    Plaintiff alleges that he was charged a $399.20 origination fee. *Id.* ¶ 27.

7.    Plaintiff alleges the interest rate charged on the loan was 17.30 percent. *Id.* ¶ 28.

8.    Plaintiff alleges that the interest and origination fee yielded an annual percentage rate of over 21 percent. *Id.* ¶ 29.

9.    Plaintiff alleges that Marlette and its "designees" are not licensed under the Pennsylvania Consumer Discount Company Act ("CDCA"), 72 P.S. §§ 6201-6219, and therefore cannot charge interest in excess of the 6 percent limit that the Pennsylvania Loan Interest and Protection Law ("LIPL") imposes on non-banks, 41 P.S. § 201(a); 7 P.S. § 6203.A. *See* Dkt. 11 ¶¶ 6-12, 38-40.

10.    Plaintiff alleges that CRB issues "Best Egg" loans to Pennsylvania consumers with interest and fees that aggregate in excess of 6 percent simple interest per year. *Id.* ¶¶ 14, 41-42.

11.    Based on these allegations, Plaintiff asserts a claim against Marlette for violation of the Pennsylvania Uniform Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201 *et seq. Id.* ¶¶ 68-72.

12.    Plaintiff seeks to certify a class defined as "[a]ll persons who, within the applicable statute of limitations, were issued a Best Egg loan and paid interest and fees that aggregated in excess of 6% simple interest per year." *Id.* ¶ 61.

***Henry Enters Into the Loan Agreement***

13.    On October 13, 2015, Henry applied for a "Best Egg" loan and entered into a loan agreement with CRB through the "Best Egg" online lending platform ("Loan Agreement"). *See* Declaration of Alessandro Rhodes ("Rhodes Decl."), attached to Marlette's Appendix in Support

- 2 -

of Third Motion to Compel Individual Arbitration ("Appendix") as **Exhibit 1**, ¶ 3; Loan Agreement, attached to the Appendix as **Exhibit 2**.

14.     Marlette has maintained a document depicting the "Application Flow" for the "Best Egg" online lending platform that was in effect when Henry applied for his loan on October 13, 2015 ("Application Flow").  *See* Rhodes Decl. ¶ 4; Application Flow, attached to the Appendix as **Exhibit 3**.

15.     The Application Flow depicts the sequence of webpages, screens, and fields presented to borrowers completing the application for a "Best Egg" loan, such as Henry, in October 2015.  *See* Rhodes Decl. ¶ 4; Application Flow.

16.     In order to complete the online application and obtain the "Best Egg" loan, Henry was required to click a checkbox during the online application process stating "I have read the Truth in Lending Disclosure Statement (above), Loan Agreement, Credit Score Notice, and Verification and Credit Report Notice, and intend this to be my electronic signature on the Loan Agreement."  *See* Rhodes Decl. ¶ 5; Application Flow (blue in original).

17.     The screenshot from the Application Flow below shows the language presented to borrowers completing the online application for "Best Egg" loans at the time Henry applied for and was issued his "Best Egg" loan through the online lending platform:[1]

---

[1] This screenshot from the Application Flow below is a sample, but the language would have been specific to Henry when he viewed the "Best Egg" online lending platform.



*See* Rhodes Decl. ¶ 6; Application Flow.

18.    The first (blue) reference to "Loan Agreement" in the above screenshot and the statement in Paragraph 16 above contained a hyperlink to the Loan Agreement governing Henry's "Best Egg" loan.  *See* Rhodes Decl. ¶ 7; Application Flow.

19.    By clicking on this hyperlink, Henry had the opportunity to review the Loan Agreement before he completed the online application for his "Best Egg" loan.  *See* Rhodes Decl. ¶ 8.

20.    If Henry declined, or otherwise failed, to click this checkbox, as well as the E-Sign Act Consent checkbox, his electronic signature would not have been placed on the Loan

Agreement, he would not have been permitted to move to the next screen of the online application or been able to complete the online application process, and he would not have obtained his "Best Egg" loan. *Id.* ¶ 9.

21.    Marlette creates and maintains, in the course of its regularly conducted business, electronic records that detail the actions an applicant took on the "Best Egg" online lending platform, including, but not limited to, memorializing the date an applicant completes the online application for a "Best Egg" loan and accepts the governing documents, including, but not limited to, the Loan Agreement. *Id.* ¶ 10.

22.    Specifically, Marlette has maintained a log of "web events" detailing the actions Henry took on the "Best Egg" online lending platform ("Henry's Web Events Log"). *Id.* ¶ 11; Henry's Web Events Log, attached to the Appendix as **Exhibit 4**.

23.    According to Henry's Web Events Log, Henry accessed the webpage depicting the Truth in Lending Disclosure Statement at 8:58 PM UTC on October 13, 2015. *See* Rhodes Decl. ¶ 12; Henry's Web Events Log.

24.    According to Henry's Web Events Log, Henry scrolled through this webpage and clicked the checkboxes referenced above and then the "Accept and Submit" button at 8:59 PM UTC to advance to the next page in the Application Flow. *See* Rhodes Decl. ¶ 13; Henry's Web Events Log.

25.    According to Henry's Web Events Log, Henry completed the entire online application process for his "Best Egg" loan through the "Best Egg" online lending platform—specifically the remaining "bank details," "docs needed," and "application pending" webpages—on October 13, 2015 by 9:01 PM UTC. *See* Rhodes Decl. ¶ 14; Henry's Web Events Log.

26.     Despite (a) the documented actions Henry took on the "Best Egg" online lending platform, as described above; and (b) the fact that Henry has alleged the specific amount, interest rate, and origination fee terms of the "Best Egg" loan reflected in the Loan Agreement and has not produced any other writing setting forth the terms of that loan which forms the basis for his claims, Henry claims that he does not know whether his "Best Egg" loan is governed by a writing.  *See* Plaintiff's Responses to Defendant's First Set of Arbitration-Related Interrogatories and Requests for Production of Documents, attached to the Appendix as **Exhibit 5**, at Answer to Interrogatory No. 1.

***The Terms of the Loan Agreement***

27.     The Loan Agreement's "Loan Terms" were: (1) an $8,000.00 principal amount; (2) a $399.20 origination fee; (3) $7,600.80 directly given to Plaintiff; (4) a 17.30 percent interest rate; and (5) a payment schedule consisting of 35 consecutive monthly payments of $286.42 and "one final payment of the unpaid principal balance, all unpaid interest, and all unpaid fees and charges."  *See* Loan Agreement § 1; Dkt. 11 ¶¶ 22, 25-28.

28.     Plaintiff agreed that CRB could, without further notice or consent, assign the Loan Agreement.  *See* Loan Agreement § 16.

29.     Marlette maintains a "Register" for the recordation of the name and address of the holder of the Loan Agreement, including any assignee who becomes the holder of the Loan Agreement pursuant to an assignment ("Register").  *Id.*; Rhodes Decl. ¶ 16; Register, attached to the Appendix as **Exhibit 6**.

30.     The Loan Agreement provides that "[t]he entries in the Register shall be conclusive, absent manifest error, and [Henry], [CRB] or its agents or designees, and the holder of [Henry's] loan (including any assignee, if any, who becomes the holder of [Henry's] loan pursuant to an

assignment) shall treat the person whose name is recorded in the Register pursuant to the terms hereof as a holder of [Henry's] loan hereunder for all purposes of th[e] [Loan] Agreement." *See* Loan Agreement § 16.

31.    "Recordation in the Register is the sole means of assignment or transfer of the holder's (or its assignee's) interest in [Henry's] loan." *Id.*

32.    The Loan Agreement provided that CRB is located in New Jersey and that the Loan Agreement "will be entered into" in New Jersey. *Id.* § 24.

33.    The provisions of the Loan Agreement "will be governed by" federal law and, to the extent that state law applies, New Jersey law, without regard to conflicts of law principles. *Id.*

34.    The Loan Agreement contains a broad arbitration provision under which Plaintiff and CRB (and its assignees) delineated specific procedures for the arbitration of disputes (the "Arbitration Provision"). *Id.* § 25.

35.    Under the Arbitration Provision:

> Either party to this Agreement, ***or any subsequent assignee of this Agreement***, may, ***at its sole election***, require that the sole and exclusive forum and remedy for ***resolution of a Claim be final and binding arbitration*** pursuant to this paragraph 25 (the "Arbitration Provision"), unless you opt out as provided in paragraph 25(b) below.  As used in this Arbitration Provision, "Claim" shall include any past, present, or future claim, dispute, or controversy involving you (or persons claiming through or connected with you), on the one hand, and us and/or ***any assignee*** (or persons claiming through or connected with us and/or any assignee), on the other hand, ***relating to or arising out of this Agreement and/or the activities or relationships that involve, lead to, or result from this Agreement, including*** (except to the extent provided otherwise in the last sentence of paragraph 25(f) below) ***the validity or enforceability of this Arbitration Provision, any part thereof, or the entire Agreement.***  Claims are subject to arbitration regardless of whether they arise from contract; tort (intentional or otherwise); a constitution, ***statute***, common law, or principles of equity; or otherwise.  Claims include matters arising as initial claims, counter-claims, cross-claims, third-party claims, or otherwise.  The scope of this Arbitration Provision is to be given the broadest possible interpretation that is enforceable.

*Id.* § 25.a. (emphasis added).

36.     The Arbitration Provision granted Plaintiff the right to opt out of the Arbitration Provision within thirty (30) days of executing the Loan Agreement. *Id.* § 25.b.

37.     Plaintiff did not exercise his right to opt out of the Arbitration Provision. *See generally* Dkt. 11; *see also* Rhodes Decl. ¶ 15.

38.     The Arbitration Provision provides that no arbitration will proceed on a class, representative, or collective basis. *See* Loan Agreement § 25.f.

39.     The Arbitration Provision was entered pursuant to a transaction involving interstate commerce and is governed by and enforceable under the FAA. *Id.* § 25.g.

40.     The Arbitration Provision survives, among other things, closure of the relationship of the parties and any transfer of the Loan Agreement or the loan to another person or entity. *Id.* § 25.h.

41.     The parties waived their right to litigate Claims in a court before a judge or jury upon election of arbitration by any party. *Id.*

42.     Finally, as referenced above, Plaintiff accepted and electronically signed the Loan Agreement on October 13, 2015. *Id.*at 9.

**Assignments of the Loan Agreement**

43.     Although pursuant to the Loan Agreement the Register is conclusive as to assignment or transfer of the Loan Agreement, Marlette also maintains business records reflecting the assignments of the Loan Agreement identified within the Register. *See* Rhodes Decl. ¶ 17.

44.     By way of background with respect to the assignments of Henry's Loan Agreement described herein, each entity is a 100% wholly-owned subsidiary of Marlette Funding, LLC. *Id.* ¶ 18. Marlette is the sole member of MF Asset Holdings, LLC. *Id.*  MF Asset Holdings, LLC, in turn, is the sole beneficial owner of MF Consumer Loan Trust, and MF Consumer Loan Trust is

the sole beneficial owner of MF Trust 2015-A. *Id.* MF Asset Holdings, LLC, MF Consumer Loan Trust, and MF Trust 2015-A are each referred to herein as a "Marlette Subsidiary."

45.     Due in part to the high volume of loans assigned to and between Marlette Subsidiaries, Marlette's business practice is to record assignments that occur on a particular day and that involve a particular Marlette Subsidiary in Excel spreadsheets. *Id.* ¶ 19.

46.     As stated in the Register, on October 16, 2015, CRB, the entity with whom Henry entered into the Loan Agreement, assigned all rights, title, and interest in Henry's "Best Egg" loan (including the Loan Agreement) to Marlette Subsidiary, MF Consumer Loan Trust, which is referred to as "Marlette Funding Consumer Loan Trust" in the Register. *Id.* ¶ 20; Register; Marlette's Business Records Reflecting October 16, 2015 Assignment From CRB to MF Consumer Loan Trust, attached to the Appendix as **Exhibit 7**; *see also* Dkt. 11 ¶ 23 (alleging that two days after CRB issued the Loan Agreement to Plaintiff, CRB "sold the loan to one of [Marlette's] non-bank designees.").

47.     As stated in the Register, on March 28, 2016, MF Consumer Loan Trust assigned all rights, title, and interest in Henry's "Best Egg" loan (including the Loan Agreement) to another Marlette Subsidiary, MF Trust 2015-A. *See* Rhodes Decl. ¶ 21; Register; Marlette's Business Records Reflecting March 28, 2016 Assignment From MF Consumer Loan Trust to MF Trust 2015-A, attached to the Appendix as **Exhibit 8**.

48.     As stated in the Register, on August 2, 2016, MF Trust 2015-A assigned all rights, title, and interest in Henry's "Best Egg" loan (including the Loan Agreement) back to Marlette Subsidiary, MF Consumer Loan Trust. *See* Rhodes Decl. ¶ 22; Register; Marlette's Business Records Reflecting August 2, 2016 Assignment From MF Trust 2015-A to MF Consumer Loan Trust, attached to the Appendix as **Exhibit 9**.

49.    As stated in the Register, on July 27, 2020, MF Consumer Loan Trust assigned all rights, title, and interest in Henry's "Best Egg" loan (including the Loan Agreement) to UHG I, LLC.  *See* Rhodes Decl. ¶ 23; Register.

### *Marlette's Role as Administrator and Servicer*

50.    Pursuant to the September 15, 2015 Amended and Restated Trust Agreement of MF Consumer Loan Trust ("MF Consumer Loan Trust Amended Trust Agreement"), Marlette is the Administrator of the MF Consumer Loan Trust.  *See* Rhodes Decl. ¶ 24; MF Consumer Loan Trust Amended Trust Agreement Excerpts, attached to the Appendix as **Exhibit 10**.[2]

51.    Section 11.01(a) of the MF Consumer Loan Trust Amended Trust Agreement, which is entitled "Duties with Respect to the Trust" and contained within Article XI Administrator, states, in relevant part:

> (a) Marlette Funding, LLC, in the capacity of Administrator as provided in this Section 11.01 hereby agrees to act as an agent of the Trust and is hereby appointed by the current Beneficial Owners pursuant to Section 3806(b)(7) of the Statutory Trust Act as an independent contractor acting as an agent of the Trust, having full power, authority and authorization to manage and administer the business and affairs of the Trust and to perform its obligations as Administrator hereunder; *provided*, *however*, that the Administrator may be removed, or replaced with a successor administrator, by the written instructions of the Requisite Owners to the Administrator and the Owner Trustee. The Administrator shall, and shall have the authority and power and authorization to, act on behalf of the Trust:
>
> > (i) to administer, perform, execute, manage or supervise any lawful activities of the Trust and involving the Trust Property, which are authorized pursuant to Section 2.03 and are reasonably within the capability of the Administrator, and which shall include, without limitation, entering into and executing Transaction Documents on behalf of the Trust and taking all action as it shall be the right or duty of the Trust to take pursuant to this Agreement or any of the Transaction Documents;

---

[2] Marlette attached only the pertinent provisions of the MF Consumer Loan Trust Amended Trust Agreement; however, Marlette would be glad to provide the entire agreement to the Court upon request.

> (ii) to enforce any agreement entered into by the Trust or pursuant to which it is a beneficiary or has any rights, including any of the Transaction Documents to which the Trust is or will be a party[.]

*See* Rhodes Decl. ¶ 25; MF Consumer Loan Trust Amended Trust Agreement.

52.     Marlette also was the servicer of Henry's loan at the time it was assigned to MF Consumer Loan Trust, and continued to service the loan on behalf of MF Consumer Loan Trust while it held the loan.  *See* Rhodes Decl. ¶ 26.

53.     Pursuant to the September 15, 2015 Amended and Restated Trust Agreement of MF Trust 2015-A ("MF Trust 2015-A Amended Trust Agreement"), Marlette is the Administrator of the MF Trust 2015-A.  *Id.* ¶ 27; MF Trust 2015-A Amended Trust Agreement Excerpts, attached to the Appendix as **Exhibit 11**.[3]

54.     Section 11.01(a) of the MF Trust 2015-A Amended Trust Agreement, which is entitled "Duties with Respect to the Trust" and contained within Article XI Administrator, states, in relevant part:

> (a) Marlette Funding, LLC, in the capacity of Administrator as provided in this Section 11.01 hereby agrees to act as an agent of the Trust and is hereby appointed by the current Beneficial Owners pursuant to Section 3806(b)(7) of the Statutory Trust Act as an independent contractor acting as an agent of the Trust, having full power, authority and authorization to manage and administer the business and affairs of the Trust and to perform its obligations as Administrator hereunder; *provided*, *however*, that the Administrator may be removed, or replaced with a successor administrator, by either (i) the Agent, but only in the case of the occurrence and continuance of a Servicer Event of Default, for Cause (each, as defined in the Credit Agreement) or if the Administrator fails to materially satisfy its duties as Administrator hereunder and such failure continues for a period of ten (10) Business Days after the earlier (x) written notice from the Agent has been provided to the Administrator specifying such failure with particularity and (y) actual knowledge of the Administrator, or (ii) at the written instructions of the Requisite Owners, with the prior written consent of the Agent (which consent shall not be unreasonably withheld), to the Administrator and the Owner Trustee. The

---

[3] Marlette attached only the pertinent provisions of the MF Trust 2015-A Amended Trust Agreement; however, Marlette would be glad to provide the entire agreement to the Court upon request.

Administrator shall, and shall have the authority and power and authorization to, act on behalf of the Trust:

(i) to administer, perform, execute, manage or supervise any lawful activities of the Trust and involving the Trust Property, which are authorized pursuant to Section 2.03 and are reasonably within the capability of the Administrator, and which shall include, without limitation, entering into and executing Transaction Documents on behalf of the Trust and taking all action as it shall be the right or duty of the Trust to take pursuant to this Agreement or any of the Transaction Documents; *provided, however*, except as directed by the Beneficial Owners, the Administrator is expressly prohibited from both withdrawing capital or Trust Property from the Trust except for the benefit of the Beneficial Owners;

(ii) to enforce any agreement entered into by the Trust or pursuant to which it is a beneficiary or has any rights, including any of the Transaction Documents to which the Trust is or will be a party[.]

*See* Rhodes Decl. ¶ 28; MF Trust 2015-A Amended Trust Agreement.

55.    Marlette also was the servicer of Henry's loan at the time it was assigned to MF Trust 2015-A, and continued to service the loan on behalf of MF-Trust 2015-A while it held the loan.  *See* Rhodes Decl. ¶ 29.

Dated: May 27, 2022

**REED SMITH LLP**

*/s/ Justin J. Kontul*
Justin J. Kontul
Pa. I.D. No. 206026
Alex G. Mahfood
Pa. I.D. No. 324047
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
T: (412) 288-3131
F: (412) 288-3063
jkontul@reedsmith.com
amahfood@reedsmith.com

*Counsel for Defendant*
*Marlette Funding, LLC*
*d/b/a Best Egg*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on May 27, 2022, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system, which will send notification of such filing to counsel or parties

of record electronically by CM/ECF.

<u>*/s/ Justin J. Kontul*</u>