**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

RONALD HENRY, individually and
on behalf of all others similarly situated,

               Plaintiff,

    v.

MARLETTE FUNDING, LLC d/b/a BEST
EGG,

               Defendant.

Case No. 2:21-cv-00985

**PLAINTIFF'S RESPONSE TO DEFENDANT'S CONCISE
STATEMENT OF MATERIAL FACTS IN SUPPORT OF THIRD
MOTION TO COMPEL INDIVIDUAL ARBITRATION**

1.      Admitted that Marlette "operates a lending platform at bestegg.com, through which [it] accepts loan applications." (Doc. 11 ¶ 13.) Otherwise, denied. The First Amended Complaint speaks for itself.

2.      Admitted that after Marlette "evaluates a consumer's creditworthiness and makes a loan offer, [it] requests that Cross River Bank . . . issue the loan." (*Id.* ¶ 14.) Otherwise, denied. The First Amended Complaint speaks for itself.

3.      Admitted that "[t]wo days after it issues the loan, Cross River [Bank] sells the loan back to [Marlette] or [its] non-bank designees without recourse." (*Id.* ¶ 15.) Otherwise, denied. The First Amended Complaint speaks for itself.

4.      Admitted that "[i]n October of 2015, Cross River [Bank] issued a personal loan to Henry," that "[t]he loan was used for personal, family, and/or household purposes," and that "[t]he loan was issued in the amount of $8,000.00." (*Id.* ¶¶ 22, 25-26.) Otherwise, denied. The First Amended Complaint speaks for itself.

5.     Admitted that "[t]wo days letter, Cross River [Bank] allegedly sold the loan to one of [Marlette]'s non-bank designees." (*Id.* ¶ 23.) Otherwise, denied. The First Amended Complaint speaks for itself.

6.     Admitted that "Henry only received $7,600.80 of actual money because [Marlette] charged and deducted a $399.20 'origination fee.'" (*Id.* ¶ 27.) Otherwise, denied. The First Amended Complaint speaks for itself.

7.     Admitted that "[i]nterest was also charged on the loan at a rate of 17.30%." (*Id.* ¶ 28.) Otherwise, denied. The First Amended Complaint speaks for itself.

8.     Admitted that "[t]he interest and origination fee yielded an annual percentage rate of over 21%." (*Id.* ¶ 29.) Otherwise, denied. The First Amended Complaint speaks for itself.

9.     Admitted that Marlette "and its non-bank designees are non-banks without CDCA licenses," that Marlette, accordingly, "is not authorized under any law to charge interest above the LIPL's 6% interest rate cap on any loan for which [Marlette] seeks to charge interest on behalf of itself or its non-bank designees," and that "[t]his means the CDCA prohibits [Marlette] from charging, collecting, contracting for, or receiving interest and fees that aggregate in excess of 6% simple interest per year." (*Id.* ¶¶ 38-40.) Otherwise, denied. The First Amended Complaint speaks for itself.

10.     Admitted that Marlette "routinely issues loans with interest and fees that aggregate in excess of 6% simple interest per year, and charges, collects, contracts for, or receives such interest and fees from Pennsylvania consumers," and that Marlette "cannot charge, collect, contract for, or receive most of the interest and fees it charges, collects, contracts for, or receives because [Marlette] and its non-bank designees do not have and have never had the license to do so." (*Id.* ¶¶ 41-42.) Otherwise, denied. The First Amended Complaint speaks for itself.

11. Admitted.

12. Admitted.

13. Admitted that Henry applied for and obtained a loan through bestegg.com, which is Marlette's online lending platform. Otherwise, denied. Henry disputes that he agreed to arbitrate his claims by obtaining a loan. Marlette does not claim that Henry read the Loan Agreement, was ever presented its terms, or that Marlette mailed, emailed, or otherwise sent a physical copy to Henry. (*See generally* Doc. 33.) Rather, Marlette claims Henry assented to the Loan Agreement by visiting a Truth in Lending Disclosure Statement webpage at 8:58 PM UTC on October 13, 2015, and then, a minute later, clicking an "Accept and Submit" button at 8:59 PM UTC. (*Id.* ¶¶ 13-25.) This webpage instructs users to "scroll to review your entire Truth in Lending Disclosure Statement before accepting the terms." (Doc. 35-3, ECF p. 13.) The scroll box then sets forth the material loan terms, including rates and repayment information. (*Id.* at ECF p. 14.) But, unbeknownst to users, the Loan Agreement includes additional material terms that are unrelated to the material terms set forth in the scroll box. (Doc. 35-2 ¶ 25.) The scroll box does not warn users that the Loan Agreement has additional material terms[1] that are unrelated to those displayed to users. Nor does it state that users must alter their legal rights and give up their right to be heard in court to obtain a loan. Instead, the scroll box misleads users to believe the material terms of their loan have already been presented. This type of misleading website presentation is insufficient to bind Henry or any other website users to the arbitration agreement that is hidden in the Loan

---

[1] A mandatory arbitration clause is a material contractual term. *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 392 (E.D.N.Y. 2015) ("Arbitration, which often involves forgoing the right to become a member of a class action, is a significant legal issue that the Supreme Court has equated to other materials terms in a contract."); *id*. at 404 (stating arbitration clauses "materially alter [consumers'] substantive default rights"); *Universal Plumbing & Piping Supply, Inc. v. John C. Grimberg Co.*, 596 F. Supp. 1383, 1385 (W.D. Pa. 1984) (agreeing with various other courts that "an arbitration clause is a material term requiring assent of both parties").

Agreement and never presented to users. *See, e.g.*, *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035-36 (7th Cir. 2016) (affirming denial of motion to compel where website "actively misle[d] the customer"); *Shron v. LendingClub Corp.*, No. 19-cv-06718, 2020 U.S. Dist. LEXIS 122657, at *13 (S.D.N.Y. July 13, 2020) (denying motion to compel where a user "could reasonably have believed that [the loan and borrower membership] agreements reflected her consent to borrowing the loan amount applied for—as suggested by the words '[l]oan' and '[b]orrower'—but not that such agreements [] affect[ed] the scope of her legal rights and remedies.");[2] *Kemenosh v. Uber Techs., Inc.*, No. 181102703, 2020 Phila. Ct. Com. Pl. LEXIS 1, at *14-18 (C.C.P. Phila. Jan. 3, 2020) (denying motion to compel after finding webpage failed to "properly communicate an offer to arbitrate under Pennsylvania law" where webpage did not instruct user to read hyperlinked contract or disclose that it contained additional material terms); *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016) (quoting *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177-78 (9th Cir. 2014)) (recognizing where, as here, a webpage displays some terms, but hides others in hyperlinks, determining whether a user has sufficient notice of the hidden terms "depends heavily on whether the design and content of that webpage rendered the existence of [the hidden] terms reasonably conspicuous"); *cf. Bacon v. Avis Budget Grp., Inc.*, 959 F.3d 590, 602-03 (3d Cir. 2020) (finding consumer lacked notice of arbitration clause on back side of a two-sided agreement because front side "impl[ied] that the 'Agreement' consist[ed] of the text only on the front side," which is similar to this case because Marlette's scroll box implied it contained the material loan terms when, in reality, the Loan Agreement contained additional and unrelated

---

[2] Although *Shron* was subsequently vacated, that did not occur because the decision was wrong or overturned on appeal. Instead, the parties, as part of a settlement agreement, requested the court to vacate the decision. *See Shron v. LendingClub Corp.*, No. 19-cv-06718, 2020 U.S. Dist. LEXIS 223433 (S.D.N.Y. Nov. 30, 2020).

material terms that affected a consumer's legal rights and ability to bring claims in court).

Accordingly, Henry denies that he agreed to arbitrate his claims.

14.     Admitted.

15.     Admitted.

16.     Admitted.

17.     Admitted.

18.     Admitted.

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Admitted.

23.     Admitted.

24.     Admitted.

25.     Admitted.

26.     Admitted that Henry has no personal knowledge as to whether the Loan Agreement

governs his loan. Marlette seems to suggest Henry should have such knowledge, because he visited

Marlette's online lending platform, but this suggestion is unreasonable. Marlette never mailed or

emailed Henry the Loan Agreement, nor do Marlette's records show that the Loan Agreement was

ever displayed to Henry. Rather, as Marlette admits, its records show that Henry clicked a button

and was never shown the Loan Agreement or provided with a physical copy of its terms. It is

unclear how someone can have knowledge about a document that was never presented or sent to

them. It also is unclear how Marlette can reasonably expect an individual, who Marlette admits

visited its website seven years ago and was only on the webpage at issue for a minute, at most,

(Doc. 33 ¶¶ 23-24 (stating Henry landed on the webpage at issue at 8:58 PM UTC and left the webpage at issue at 8:59 PM UTC)), to remember what was displayed on the webpage or the contents of contracts that were hidden in hyperlinks. Marlette also suggests Henry should have such knowledge because the Loan Agreement is the only document that shows the loan terms, but this is untrue. To provide just one example, Marlette itself produced evidence showing the "Loan Terms" are displayed on a Truth in Lending Disclosure Statement, which is actually presented to users, unlike the Loan Agreement and arbitration clause, which are hidden from users and were not presented to Henry. (Doc. 35-3, ECF pp. 13-14.) Additionally, as explained in Henry's response to Marlette's motion, simple math can prove, and Marlette's own payment records show, the interest and fees Marlette charged. In short, Henry lacks any personal knowledge as to whether Marlette's evidence, including the websites and agreements Marlette has produced, are accurate. Marlette's claim that Henry should have such knowledge is unreasonable and unrealistic.

27.     Admitted that the "Loan Terms," which include the principal amount, origination fee, the amount given to Henry, the interest rate, and the payment schedule, are displayed in the Loan Agreement. Denied that such terms originated there. Instead, as Marlette's evidence shows, the "Loan Terms" were presented on a page that stated, "Please scroll to review your entire Truth in Lending Disclosure Statement before accepting the terms." (Doc. 35-3, ECF p. 13.) The "Loan Terms" were displayed apart from the Loan Agreement. (*Id.*) The "Loan Terms" also failed to mention that consumers were required to give up their legal rights in order to obtain a loan. (*Id.* at ECF p. 14 (displaying full Truth in Lending Disclosure Statement, which only mentions information about loan rates, amount, and repayment terms).)

28.     Admitted that the Loan Agreement states, "You agree that we may, without further prior notice to or consent from you, assign any or all of our right, title and interest in this Agreement

6

and your loan, including record of this loan, the debt incurred, any transfer of the obligation and your promise to repay, to anyone." (Doc. 35-2 ¶ 16.) Otherwise, denied. The Loan Agreement speaks for itself.

29.     Admitted.

30.     Admitted that the Loan Agreement states, "The entries in the Register shall be conclusive absent manifest error, and you, Cross River Bank or its agents or designees, and the holder of your loan (including any assignee, if any, who becomes the holder of your loan pursuant to an assignment) shall treat the person whose name is recorded in the Register pursuant to the terms hereof as a holder of your loan hereunder for all purposes of this Agreement." (*Id*.) Otherwise, denied. The Loan Agreement speaks for itself.

31.     Admitted that the Loan Agreement states, "Recordation in the Register is the sole means of assignment or transfer of the holder's (or its assignee's) interest in your loan." (*Id.*) Otherwise, denied. The Loan Agreement speaks for itself.

32.     Admitted that the Loan Agreement states, "We are located in the state of New Jersey and this Agreement will be entered into in the state of New Jersey." (*Id.* ¶ 24.) Otherwise, denied. The Loan Agreement speaks for itself.

33.     Admitted that the Loan Agreement states, "The provisions of this Agreement will be governed by federal laws and, to the extent that state law applies, the laws of the state of New Jersey, without regard to any principle of conflicts of laws that would require or permit the application of the laws of any other jurisdiction." (*Id.*) Otherwise, denied. The Loan Agreement speaks for itself.

34.     Admitted that the Loan Agreement contains an arbitration provision. (*Id.* ¶ 25.) Otherwise, denied. The Loan Agreement speaks for itself.

35.    Admitted.

36.    Admitted that the Loan Agreement states, "You may opt out of this Arbitration Provision for all purposes by sending an arbitration opt out notice to P.O. Box 3999 St. Joseph, MO 64503-0999, which is received at the specified address within 30 days of the date of your electronic acceptance of the terms of this Agreement." (*Id.* ¶ 25.b.) Otherwise, denied. The Loan Agreement speaks for itself.

37.    Admitted.

38.    Admitted that the Loan Agreement states, "No arbitration shall proceed on a class, representative, or collective basis (including as private attorney general on behalf of others), even if the claim or claims that are the subject of the arbitration had previously been asserted (or could have been asserted) in a court as class representative, or collective actions in a court." (*Id.* ¶ 25.f.) Otherwise, denied. The Loan Agreement speaks for itself.

39.    Admitted that the Loan Agreement states, "This Arbitration Provision is made pursuant to a transaction involving interstate commerce and shall be governed by and enforceable under the FAA." (*Id.* ¶ 25.g.) Otherwise, denied. The Loan Agreement speaks for itself.

40.    Admitted that the Loan Agreement states, "This Arbitration Provision shall survive (i) suspension, termination, revocation, closure, or amendments to this Agreement and the relationship of the parties and/or assignees; (ii) the bankruptcy or insolvency of any party or other person; and (iii) any transfer of any loan or this Agreement to any other person or entity." (*Id.* ¶ 25.h.) Otherwise, denied. The Loan Agreement speaks for itself.

41.    Admitted that the Loan Agreement states, "The parties acknowledge that they have a right to litigate claims through a court before a judge or jury, but will not have that right if any party elects arbitration pursuant to this arbitration provision. The parties hereby knowingly and

voluntarily waive their rights to litigate such claims in a court before a judge or jury upon election of arbitration by any party." (*Id.*) Otherwise, denied. The Loan Agreement speaks for itself.

42.     *See* Response to Paragraph 13.

43.     Denied. Marlette has not produced any records, other than the Loan Register, to prove that the Loan Agreement was transferred.

44.     Denied. Marlette does not cite any operating agreements, trust agreements, or other documentary evidence to prove the facts asserted in this Paragraph. Instead, Marlette relies entirely on the testimony of one of its employees. Yet the employee does not describe or explain the basis for his knowledge of the facts asserted herein, which is necessary for his testimony to be admitted. Fed. R. Evid. 602. Additionally, to the extent the employee is attempting to prove the contents of operating agreements, trust agreements, or some other writing, the original or duplicates of those writings are required. Fed. R. Evid. 1002, 1003.

45.     Admitted.

46.     Admitted.

47.     Admitted.

48.     Admitted.

49.     Admitted.

50.     Admitted that the Amended and Restated Trust Agreement of MF Consumer Loan Trust defines Marlette as an "Administrator." (Doc. 35-10.) Otherwise, denied. The Trust Agreement speaks for itself.

51.     Admitted.

52.     Admitted that Marlette "routinely issues loans with interest and fees that aggregate in excess of 6% simple interest per year, and charges, collects, contracts for, or receives such

9

interest and fees from Pennsylvania consumers." (Doc. 11 ¶ 41.) Also admitted that Marlette issued such a loan to Henry and charged, collected, contracted for, or received such interest and fees with respect to the loan. (*Id.* ¶¶ 22-37.) Otherwise, denied. Marlette does not cite a servicing agreement or any other documentary evidence to prove the facts asserted in this Paragraph. Instead, Marlette relies entirely on the testimony of one of its employees. Yet the employee does not describe or explain the basis for his knowledge of the facts asserted herein, which is necessary for his testimony to be admitted. Fed. R. Evid. 602. Additionally, to the extent the employee is attempting to prove the contents of servicing agreements or some other writing, the original or duplicates of those writings are required. Fed. R. Evid. 1002, 1003.

53.     Admitted that the Amended and Restated Trust Agreement of MF Trust 2015-A defines Marlette as an "Administrator." (Doc. 35-11.) Otherwise, denied. The Trust Agreement speaks for itself.

54.     Admitted.

55.     Admitted that Marlette "routinely issues loans with interest and fees that aggregate in excess of 6% simple interest per year, and charges, collects, contracts for, or receives such interest and fees from Pennsylvania consumers." (Doc. 11 ¶ 41.) Also admitted that Marlette issued such a loan to Henry and charged, collected, contracted for, or received such interest and fees with respect to the loan. (*Id.* ¶¶ 22-37.) Otherwise, denied. Marlette does not cite a servicing agreement or any other documentary evidence to prove the facts asserted in this Paragraph. Instead, Marlette relies entirely on the testimony of one of its employees. Yet the employee does not describe or explain the basis for his knowledge of the facts asserted herein, which is necessary for his testimony to be admitted. Fed. R. Evid. 602. Additionally, to the extent the employee is attempting

10

to prove the contents of servicing agreements or some other writing, the original or duplicates of those writings are required. Fed. R. Evid. 1002, 1003.

Respectfully submitted,

Dated: July 8, 2022          By:   */s/ Kevin Abramowicz*
Kevin Abramowicz
Kevin Tucker
Stephanie Moore
Chandler Steiger
**East End Trial Group LLC**
6901 Lynn Way, Suite 215
Pittsburgh, PA 15208
Tel: (412) 223-5740
Fax: (412) 626-7101
kabramowicz@eastendtrialgroup.com
ktucker@eastendtrialgroup.com
smoore@eastendtrialgroup.com
csteiger@eastendtrialgroup.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 8, 2022, Plaintiff's Response to Defendant's Concise Statement of Material Facts in Support of Third Motion to Compel Individual Arbitration was served by email on the following:

**REED SMITH LLP**
Justin J. Kontul
Alex G. Mahfood
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
jknotul@reedsmith.com
amahfood@reedsmith.com

*/s/ Kevin Abramowicz*
Kevin Abramowicz

11