# EXHIBIT A

# Chilutti v. Uber Techs., Inc.

Superior Court of Pennsylvania

October 12, 2022, Decided; October 12, 2022, Filed

No. 1023 EDA 2021

**Reporter**

2022 Pa. Super. LEXIS 419 *; 2022 PA Super 172

SHANNON CHILUTTI AND KEITH CHILUTTI, H/W, Appellants v. UBER TECHNOLOGIES, INC., GEGEN LLC, RAISER-PA, LLC, RAISER, LLC, SARAH'S CAR CARE, INC. MOHAMMED BASHEIR

**Prior History: [*1]** Appeal from the Order Entered April 26, 2021, In the Court of Common Pleas of Philadelphia County Civil Division at No(s): 200900764.

**Counsel:** For Chilutti and Shannon Chilutti, Keith, Appellant: Megan Marie Kwak, Joseph L. Messa, Jr., Messa & Associates, P.C., Philadelphia, PA.

For Uber Tech. Inc., Gegen, LLC, Raiser-PA, LLC, Raiser, LLC, Appellee: Madeline Sophia Baio, Vaughan Baio & Partners, Philadelphia, PA; Michael Lee Kichline, Matthew Daniel Klayman, Morgan Lewis & Bockius, LLP, Philadelphia, PA.

For Sarah's Car Care, Inc. and Mohammed Basheir, Appellee: Thomas McKenzie, Marshall Dennehey Warner Coleman & Goggin, PC, Philadelphia, PA; Robert James Cosgrove, John L. Lang, Jr., Wade Clark Mulcahy, LLP, Philadelphia, PA; John Ryan Freeman, McCormick & Priore PC, Philadelphia, PA.

**Judges:** BEFORE: STABILE, J., DUBOW, J., and McCAFFERY, J. Judge Dubow joins the Opinion. Judge Stabile files a Dissenting Opinion. OPINION BY McCAFFERY, J.

**Opinion by:** McCAFFERY

# Opinion

OPINION BY McCAFFERY, J.:

This appeal arises out of a motor vehicle accident that occurred on March 20, 2019. On that date, Shannon Chilutti, who is wheelchair bound, was injured while riding in a car provided by the transportation service company, Uber Technologies, **[*2]** Inc. (Uber), on the way home from a medical appointment in Langhorne, Pennsylvania.[1] Central to this case is whether a party should be deprived of their constitutional right to a jury trial when they purportedly enter into an arbitration agreement *via* a set of hyperlinked "terms and conditions" on a website or smartphone application that they never clicked on, viewed, or read.

This Commonwealth guarantees its citizens a constitutional right to a jury trial: "**Trial by jury shall be as heretofore, and the right thereof remain inviolate**." PA CONST. art. 1, § 6 (emphasis added).[2] "Inviolate" is defined as "[f]ree from violation; not broken, infringed, or impaired." Black's Law Dictionary, "INVIOLATE" (11th ed. 2019). Since 1847, the Pennsylvania Supreme Court has safeguarded this constitutional protection

---

[1] *See* Complaint, 9/17/20, at 5-6. Her husband, Keith Chilutti, was also in the vehicle at the time of the accident. *Id.* We collectively refer to the Chiluttis as "Appellants."

[2] "This right, as preserved in the Seventh Amendment of the United States Constitution, 'is enshrined in the Pennsylvania Constitution,' and . . . does not differentiate between civil cases and criminal cases.'" *Pisano v. Extendicare Homes, Inc.*, 2013 PA Super 232, 77 A.3d 651, 662 (Pa. Super. 2013), *quoting Bruckshaw v. Frankford Hospital of City of Philadelphia*, 619 Pa. 135, 58 A.3d 102, 108-09 (Pa. 2012).

by recognizing that a victim who has suffered personal injuries is guaranteed the right to a jury trial:

> The bill of rights, which is forever excluded from legislative invasion, declares that the trial by jury shall remain as heretofore, and the right thereof be inviolate; that all courts shall be open, and that every man shall have redress by the due course of law, and that no man can be deprived of his **[*3]** right, except by the judgment of his peers or the law of the land.

*Brown v. Hummel*, 6 Pa. 86, 90 (1847).

As will be discussed below, when Appellants filed the negligence lawsuit, Uber, Raiser-PA LLC, Raiser, LLC, (collectively, Uber Appellees) moved to compel arbitration, asserting that the couple's conduct on the company's website and application, when they registered for the ridesharing service, signified that they agreed to be bound by the mandatory arbitration provision found in the hyperlinked terms and conditions, thereby relinquishing their right to a jury trial. The trial court granted the petition, determining the parties had not been forced out of court. In doing so, the court failed to consider that important and protected constitutional right. Because we conclude that Appellants are legally entitled to relief, we reverse the trial court's order granting Uber Appellees' petition. We further opine that Appellants demonstrated there was a lack of a valid agreement to arbitrate; therefore, they are entitled to invoke their constitutional right to a jury trial. Accordingly, we reverse and remand for further proceedings.

The trial court recited the relevant **[*4]** facts and procedural history as follows:

> [Appellant] Shannon Chilutti, who uses a wheelchair for mobility assistance, used the Uber software application to obtain a ride home from a medical appointment. The driver of the vehicle that responded to her Uber request, Mohammed Basheir, secured Mrs. Chilutti's

wheelchair using pre-positioned retractable hooks but failed to provide a seatbelt for Mrs. Chilutti, despite her request for one. While driving, Basheir allegedly made an aggressive lefthand turn, causing Mrs. Chilutti to fall out of her wheelchair and strike her head, rendering her unconscious. [Appellant] Keith Chilutti was riding in the vehicle and observed his wife fall and strike her head.

> On September 17, 2020, [Appellants] filed a complaint seeking to recover for injuries sustained as a result of the March 20, 2019 incident. [Uber Appellees] filed a petition to compel arbitration in which they argued the terms and conditions of the Uber application required [Appellants] to arbitrate their claims. Following extensive briefing by the parties, th[e trial] court granted the petition to compel arbitration and stayed this matter as to [Uber Appellees on April 26, 2021].

Trial Court **[*5]** Opinion, 6/2/21, at 1-2 (citations and some capitalization omitted).

This timely appeal followed.[3],[4]

Appellants raise one issue on appeal:

> Did the trial court err in granting [Appellees'] Petition to Compel Arbitration where the evidence before the trial court demonstrated that no valid agreement to arbitrate existed between the parties because [Appellees] failed to establish that Uber's registration process and/or subsequent emails properly communicated an offer to arbitrate to [Appellants] under Pennsylvania law?

Appellants' Brief at 4.

## I. Appealability and Pa.R.A.P. 313(b)

---

[3] Defendants, Sarah's Car Care, Inc., and Mohammed Basheir, are not parties to this appeal.

[4] The trial court did not order Appellants to file a concise statement of errors complained of on appeal but did file an opinion in support of its order pursuant to Pa.R.A.P. 1925(a).

Appellants first assert that the trial court's order compelling arbitration is immediately appealable as a collateral order pursuant to Pennsylvania Rule of Appellate Procedure 313(b). *See* Appellants' Brief at 26-30.

Since this issue concerns appealability, we must determine whether we have jurisdiction over this appeal. *See N.A.M. v. M.P.W.*, 2017 PA Super 254, 168 A.3d 256, 260 (Pa. Super. 2017) (citation omitted). Regarding jurisdiction,

> [t]his Court may address the merits of an appeal taken from "(a) a final order or an order certified as a final order; (2) an interlocutory order [appealable] as of right; (3) an interlocutory order [appealable] by permission; or (4) a collateral order." *Commerce Bank v. Kessler*, 2012 PA Super 100, 46 A.3d 724, 728 (Pa. Super. 2012), quoting *Stahl v. Redcay*, 2006 PA Super 55, 897 A.2d 478, 485 (Pa. Super. 2006) (citations omitted); *see also* Pa.R.A.P. 341(b). "As a general rule, **[*6]** only final orders are appealable, and final orders are defined as orders disposing of all claims and all parties." *Am. Indep. Ins. Co. v. E.S.*, 2002 PA Super 289, 809 A.2d 388, 391 (Pa. Super. 2002); *see also* Pa.R.A.P. 341(a) ("[A]n appeal may be taken as of right from any final order of a government unit or trial court.").

*Haviland v. Kline & Specter, P.C.*, 2018 PA Super 67, 182 A.3d 488, 492 (Pa. Super. 2018).

> "Thus, to determine whether finality is achieved, 'we must consider whether the practical ramification of the order will be to dispose of the case, making review appropriate.'" *Friia v. Friia*, 2001 PA Super 185, 780 A.2d 664, 667 (Pa. Super. 2001) (quoting *Kulp[ v. Hrivnak*, 2000 PA Super 407, 765 A.2d 796, 798 (Pa. Super. 2000)]). Typically, a trial court's order directing a dispute to arbitration will not be deemed final, as it does not address the merits of the parties' claims but merely transfers their existing

dispute to another forum in accordance with the arbitration provision of the underlying contract. *See Schantz v. Dodgeland*, 2003 PA Super 295, 830 A.2d 1265, 1266-67 (Pa. Super. 2003).

*Fastuca v. L.W. Molnar & Assocs.*, 2008 PA Super 99, 950 A.2d 980, 986 (Pa. Super. 2008).[5]

As mentioned above, Appellants contend that we have jurisdiction to review this appeal as a collateral order pursuant to Rule 313(b). Under Rule 313(b),

> [a] collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparable lost.

Pa.R.A.P. 313(b).

The Pennsylvania Supreme Court has previously stated:

> Rule of Appellate Procedure 313 sets forth a narrow exception **[*7]** to the general rule that only final orders are subject to appellate review. Under this exception, an interlocutory order is considered "final" and immediately appealable if (1) it is separable from and collateral to the main cause of action; (2) the right involved is too important to be denied review; and (3) the question presented is such that if review is postponed until final judgment in the case, the claimed right will be irreparably lost. This third prong requires that the matter must effectively be unreviewable on appeal from final judgment.

*Commonwealth v. Wells*, 553 Pa. 424, 719 A.2d 729, 730 (Pa. 1998) (citations omitted). *See also*

---

[5] "There exists, however, a narrow exception to this oft-stated rule for cases in which the appeal is taken from an order denying a petition to compel arbitration." *Shadduck v. Christopher J. Kaclik, Inc.*, 713 A.2d 635, 636 (Pa. Super. 1998) (citations omitted).

*Beltran v. Piersody*, 2000 PA Super 66, 748 A.2d 715, 718 (Pa. Super. 2000) (relying on *Wells*).

Here, the dispute involves the third prong — whether the question presented is such that if review is postponed until final judgment, the claimed right will be irreparably lost.[6] *See Beltran*, 748 A.2d at 718.

Appellants argue, "If this Court quashes the instant appeal and requires [Appellants] to arbitrate their claims against the Uber [Appellees] in accordance with the rule of the American Arbitration Association ("AAA"), it will result in the loss of appellate review regarding whether Uber's arbitration provision is valid under Pennsylvania law." Appellants' Brief at 28.[7]

In granting Uber Appellees' petition to compel **[\*8]** arbitration is nonappealable, the trial court stated:

> Applying the long settled precedent as set forth in *Maleski[ v. Mut. Fire, Marine & Inland Ins. Co.*, 534 Pa. 575, 633 A.2d 1143, 1145 (Pa. 1993),[8] ] it is clear this Court's Order granting the Petition to Compel Arbitration filed by Defendants Raiser LLC, Raiser-PA LLC, Gegen LLC, and Uber Technologies Inc. is not appealable at this time because the parties have not been forced "out of court."

Trial Court Opinion, 6/2/21, at 2. Notably, the trial

court (and the *Maleski* Court) did not discuss appealability as a collateral order pursuant to Rule 313. We find this omission to be critically problematic to the resolution of the present matter.

Preliminarily, it merits mention that the arbitration agreement in this case is a matter of common law because the "Dispute Resolution" Section of Shannon Chilutti's agreement[9] and the "Arbitration Agreement" Section of Keith Chilutti's agreement[10] provide that any disputes arising under the agreements are to be submitted to arbitration under the rules of the AAA and that the agreements are binding. *See* 42 Pa.C.S. § 7302(a); *Runewicz v. Keystone Ins. Co.*, 476 Pa. 456, 383 A.2d 189, 191 (Pa. 1978) (stating that a clause providing for arbitration pursuant to AAA and indicating that the parties are bound by the arbitration represents common law arbitration). *See also U.S. Claims, Inc. v. Dougherty*, 2006 PA Super 337, 914 A.2d 874, 876 (Pa. Super. 2006).

> The standard of review for a common **[\*9]** law arbitration is **very limited**:
>
>> The award of an arbitrator in a nonjudicial arbitration which is not subject to (statutory arbitration) or [to] a similar statute regulating nonjudicial arbitration proceedings is **binding** and **may not be vacated or modified unless it is clearly shown that a party was denied a hearing or that fraud, misconduct, corruption or other irregularity caused the rendition of an unjust, inequitable or unconscionable award**.
>
> The arbitrators are the **final judges of both law and fact**, and **an arbitration award is not subject to reversal for a mistake of either**. A trial court order confirming a common law arbitration award will be reversed only for an

---

[6] It is evident that the two other prongs were satisfied: (1) the question of whether the parties should be compelled to arbitration is separate and collateral to the main cause of action — whether the defendants' negligence caused the accident that injured Shannon Chilutti; and (2) the constitutional right to jury trial is a right too important to be denied review.

[7] We recognize that Appellants rely on *United Servs. Auto. Ass'n v. Shears*, 692 A.2d 161, 163 (Pa. Super. 1997) (*en banc*), to support its claim. However, we need not reach the merits of whether that case is applicable based on Appellants' overall argument and our ultimate conclusion.

[8] In *Maleski*, the Pennsylvania Supreme Court recognized the following: "[T]here is no express statutory authority providing for an appeal from an interlocutory order in a case where arbitration is compelled[.]" *Maleski*, 633 A.2d at 1146 (footnote omitted).

[9] *See* R.R. 130a-31a.

[10] *See* R.R. 172a-73a.

abuse o[f] discretion or an error of law.

*Sage v. Greenspan*, 2000 PA Super 398, 765 A.2d 1139, 1142 (Pa. Super.2000) (citations omitted; emphases added).

In accordance with *Sage*, a party must first demonstrate that a fraud, misconduct, corruption or other irregularity occurred,[11] before establishing that those malfeasances caused an unjust, inequitable or unconscionable arbitration award. The first part of this test focuses on "malfeasance" that led to the arbitration award. Notably, in a situation like here, an arbitrator's enforcement of an arbitration provision when the arbitration provision **[*10]** either failed to meet basic contract principles or violated a party's constitutional right to a jury trial cannot be considered a malfeasance; rather, it is an incorrect legal conclusion. Consequently, if the plaintiff cannot appeal the trial court's decision to enforce an arbitration provision, the plaintiff cannot challenge the legality of the arbitration provision because the arbitrator's interpretation of the legality of the arbitration is not the result of fraud, misconduct, corruption or other irregularity. Rather, it is a misinterpretation of legal principles.

Moreover, the second part of the test — that those malfeasances caused an unjust, inequitable or unconscionable arbitration award — is also problematic. The logical fallacy is that if a court determines there was no agreement to arbitrate, and that a party submitted to arbitration only because they were compelled to do so, the court could vacate an award based on a finding that the award was unjust, inequitable or unconscionable — and thus, the party would not irreparably lose their claim. However, there is always the possibility that a court may find a subsequent arbitration award was fair — meaning it was not unjust, **[*11]** inequitable, or unconscionable — even if there was no agreement to arbitrate between the parties;

resultingly, the award would remain binding on the parties. In that scenario, a party is denied their constitutional right to a jury trial, and accordingly, is "forced out of court." *See Maleski, supra*. We find it should be **clear** that a party must be provided every opportunity for a court to review the merits of the claims rather than jumping over these extremely high hurdles to seek judicial review of an arbitration award. Accordingly, we conclude that the third requirement for an appealable collateral order is satisfied because postponing review until final judgment in the case may result in the irreparable loss of Appellants' claims. Therefore, the matter is properly before us.

## II. Arbitration Provisions, Browsewrap Agreements, and the Right to a Jury Trial

Appellants next argue that the court erred in compelling them to arbitrate their claims against Uber Appellees because no valid agreement to arbitrate exists between the parties. *See* Appellants' Brief at 30-45. They state that Uber Appellees "failed to demonstrate that they properly communicated an offer to arbitrate to [Appellants] under Pennsylvania **[*12]** law." *Id.* at 32. Appellants point to the assertion that there "was no meeting of the minds . . . regarding an agreement to arbitrate[,] and "[a]t best, when [they] registered to use Uber's services, they agreed to exchange money for either transportation or food delivery services from Uber." *Id.* at 34-35.

Appellants' argument focuses on the registration process. They contend that "Uber's registration process failed to adequately communicate an offer to arbitrate in a definite manner, so as to create a meeting of the minds on a material and necessary detail of the bargained for exchange." Appellants' Brief at 35. They state:

> When Mrs. Chilutti registered for an Uber account in 2016, there was nothing on Uber's website which conveyed an offer to arbitrate or notified her that Uber's Terms of Use contained

---

[11] The question of whether Appellants were denied a hearing is not at issue in the present matter.

an arbitration provision which would require her to waive her right to a jury trial. Nor was it by any means obvious to an individual, like Mr. Chilutti, who signed up to use Uber's rideshare services in September 2018 that doing so would be accompanied by extensive terms and conditions, which included a mandatory, binding arbitration provision.

*Id.* Appellants also assert Uber Appellees **[*13]** failed to properly communicate amendments and revisions to the arbitration provisions in their subsequent communications. *Id.* at 39-45.

To determine whether arbitration should be compelled, we employ a two-part test: "The first determination is whether a valid agreement to arbitrate exists. The second determination is whether the dispute is within the scope of the agreement." *Smay v. E.R. Stuebner, Inc.*, 2004 PA Super 493, 864 A.2d 1266, 1270 (Pa. Super. 2004) (citations omitted). "Whether an agreement to arbitrate disputes exists is a question of law." *Neuhard v. Travelers Ins. Co.*, 2003 PA Super 275, 831 A.2d 602, 604 (Pa. Super. 2003). "When we review questions of law, our standard of review is limited to determining whether the trial court committed an error of law." *Id.*

To thoroughly analyze this argument, we begin with the interplay of arbitration agreements and the constitutional right to a jury trial (a right that has not been amended or modified for hundreds of years). We recognize the following:

> Pennsylvania has a well-established public policy that favors arbitration, and this policy aligns with the federal approach expressed in the Federal Arbitration Act [("FAA")]. [T]he fundamental purpose of the Federal Arbitration Act is to relieve the parties from expensive litigation and to help ease the current congestion of court calendars. Its passage was a congressional declaration of a liberal **[*14]** federal policy favoring arbitration agreements. This policy, however, was not intended to

render arbitration agreements more enforceable than other contracts, and the FAA had not been designed to preempt all state law related to arbitration. Rather, when addressing the specific issue of whether there is a valid agreement to arbitrate, courts generally should apply ordinary state-law principles that govern the formation of contracts, but in doing so, must give due regard to the federal policy favoring arbitration. [7]

[7] The FAA, however, does preempt state law that categorically prohibits arbitration of particular types of claims, which is contrary to the terms and coverage of the FAA.

*Pisano*, 77 A.3d at 661 (citations and quotation marks omitted).[12] *See also Marmet Health Care Center, Inc. v. Brown*, 565 U.S. 530, 531-33, 132 S. Ct. 1201, 182 L. Ed. 2d 42 (2012).

Nevertheless, it must be noted that the evolution and effect of arbitration provisions has substantially weakened the constitutional right to jury trial in civil proceedings. The Pennsylvania Supreme Court

---

[12] "Prior to the 1925 enactment of the FAA, courts across the country disparaged arbitration as a renegade form of adjudication, and refused to enforce private arbitration agreements." *Taylor v. Extendicare Health Facilities, Inc.*, 637 Pa. 163, 147 A.3d 490, 500-01 (Pa. 2016) (citations omitted). "During this time, when **arbitration occurred primarily** in the **commercial context between businesses of equal bargaining power**, the business interests that favored the enforcement of private arbitration agreements began to lobby state governments and Congress for legislation compelling the courts to enforce their bargains." *Id.* (emphasis added; citations omitted). Congress responded by enacting the FAA. Indeed,

> [t]he FAA **was designed to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate**, and to place such agreements upon the same footing as other contracts[.] While Congress was no doubt aware that the Act would encourage the expeditious resolution of disputes, its passage was motivated, first and foremost, by a congressional desire **to enforce [*15] agreements into which parties had entered**.

*Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989) (emphasis added; citations and quotations marks omitted).

recognized this development in **Taylor, supra**, opining:

> One of the striking consequences of the shift away from the civil justice system and toward private adjudication is that corporations are routinely stripping individuals of their constitutional right to a jury trial. **See** U.S. Const. amend. VII (preserving the right to a trial by jury); Pa. Const. art. 1, § 6 (same). While one's right to a jury trial may be waived, it is not at all apparent that signatories to arbitration agreements are aware that they waive their right to a jury trial upon the execution of an arbitration agreement.

**Taylor**, 147 A.3d at 508 (footnote omitted).

The sluggish recognition regarding the copious usage of arbitration agreements in present day contracts and the ramifications of these agreements on a party's right to a jury trial raises concern, especially in the context of Internet contracts like the one at issue herein where the parties are of purported unequal bargaining power. To that end, Pennsylvania courts have taken a small bite from the **[*16]** proverbial apple of arbitration law with respect to wrongful death actions involving negligent nursing center facilities. **See i.e., Pisano**, 77 A.3d at 661-62 ("compelling arbitration upon individuals who did not waive their right to a jury trial would infringe upon wrongful death claimants' constitutional rights"); **see also Taylor, supra**.[13] Nonetheless, the need for greater scrutiny regarding a party's waiver of their constitutional right to a jury trial in terms of these arbitration agreement matters is imperative.

By comparison, we highlight the strict scrutiny that

confessions of judgment are accorded by Pennsylvania courts. A confession of judgment, like an arbitration agreement, takes place in the commercial transaction setting. This Court has previously described the compliance requirements for a confession as follows:

> Historically, Pennsylvania law has recognized and permitted entry of confessed judgments pursuant to the authority of a warrant of attorney contained in a written agreement. [A] warrant of attorney is a contractual agreement between the parties and the parties are free to determine the manner in which the warrant may be exercised. **Entry of a valid judgment by [*17] confession must be made in rigid adherence to the provisions of the warrant of attorney; otherwise, such judgment will be stricken**. A warrant to confess judgment **must be explicit** and **will be strictly construed**, with any ambiguities resolved against the party in whose favor the warrant is given. A warrant of attorney to confess judgment **must be self-sustaining** and to be self-sustaining the warrant **must be in writing and signed by the person to be bound by it**. The **requisite signature** must bear a **direct relation** to the warrant of attorney and **may not be implied**.

**Midwest Fin. Acceptance Corp. v. Lopez**, 2013 PA Super 239, 78 A.3d 614, 623 (Pa. Super. 2013) (citations and quotation marks omitted; emphases added). "There should be no doubt that the lessee signed the warrant and that he was conscious of the fact that he was conferring a warrant upon the lessor to confess judgment in the event of breach." **Ferrick v. Bianchini**, 2013 PA Super 116, 69 A.3d 642, 651 (Pa. Super. 2013). For example, in **Graystone Bank v. Grove Estates, LP.**, 2012 PA Super 274, 58 A.3d 1277 (Pa. Super. 2012), a panel of this Court concluded that a warrant of attorney was valid because it "appeared conspicuously in all caps on the very bottom of the penultimate page of the agreement and immediately *preceded* where the

---

[13] **See also Valentino v. Phila. Triathlon, LLC**, 2016 PA Super 248, 150 A.3d 483, 494 (Pa. Super. 2016) (*en banc*) (stating, "A non-signatory wrongful death claimant . . . cannot be compelled to present his claim to an arbitrator since he has not consented to arbitration and since he possesses an independent, nonderivative right to air his claim in the forum of his choice"), *aff'd by equally divided court*, 653 Pa. 231, 209 A.3d 941 (Pa. 2019).

executor . . . signed at the top of the following, final page." *Id.* at 1283 (italics in original). The **Graystone** Court "distinguish[ed]" the case "from precedent[,]" in which **[*18]** the warrant of attorney was "located either altogether outside the body of the agreement, too remote from the signature, or on pages subsequent to the signature." *Id.*

A court will only enforce a confession of judgment provision when the court is satisfied that the party agreeing to it is aware that they waived their right to a jury trial. Generally, the courts make the "enforcement" determination when the agreement clearly and plainly states that the party is waiving, *inter alia*, their right to a jury trial. Similarly, a court should not enforce an arbitration provision in an Internet purchase agreement unless the court finds that the party agreeing to an arbitration provision was aware that he was waiving the right. It is reasonable to assume that if the arbitration provision is buried deep in webpages in tiny print, the person was not aware of the provision and it is unenforceable.

However, Internet arbitration agreements are reviewed with considerably less stringent requirements. As will be discussed below, a waiver of a right to a jury trial in the context of an Internet arbitration agreement: (1) can be inconspicuous; (2) may be contained in a hyperlink that is separate from the **[*19]** binding action like a "click" of a "I agree to these terms" button; (3) may not require a party's signature to be in direct relation to the waiver; and (4) may not require that a party even review the agreement to be bound by it.

At this juncture, we point out that courts have not addressed the importance of ensuring that a party is aware of the consequences of waiving a civil jury trial as they have in criminal proceedings. Notably, in criminal matters, a defendant's waiver to a jury trial must be explicit. A defendant "may waive a jury trial with approval by a judge of the court in which the case is pending." **Commonwealth v. Houck**, 596 Pa. 683, 948 A.2d 780, 787 (Pa. 2008)

(citation omitted). Moreover, the Rules of Criminal Procedure mandate "[t]he judge shall ascertain from the defendant whether this is a knowing and intelligent waiver, and such colloquy shall appear on the record. The waiver shall be in writing, made a part of the record, and signed by the defendant, the attorney for the Commonwealth, the judge, and the defendant's attorney as a witness." Pa.R.Crim.P. 620. We advocate that in both contexts — criminal and civil matters — it is critical that a party be fully informed of their right to a jury trial and the effect of waiving that right. We are **[*20]** not suggesting that an on-the-record colloquy is necessary in civil litigation like in criminal proceedings — just that, again, waiver must be clearly described and understood to be giving up a constitutional right to a jury trial.

With this in mind, we highlight that we live in an age where Internet users are asked to form contracts with companies on a daily basis using web-based or mobile application technology. These agreements run the gamut from a mortgage loan to a clothing sales transaction to registration for a transportation or ride-hailing service. Notably, "[d]ifferent Internet products lead to different expectations and applications of legal doctrine." Paul J. Morrow, Esq., *Cyberlaw: The Unconscionability/Unenforceability of Contracts (Shrink-Wrap, Clickwrap, and Browse-Wrap) on the Internet: A Multidistrict Analysis Showing the Need for Oversight*, 11 U.P.H. J. Tech. L. Pol'y 7 (Spring 2011). With these Internet contracts, it is now easier than ever for corporations to bind inexperienced, unaware, and unsuspecting consumers to arbitration agreements with the simple click or swipe of their finger — all from the convenience of 3-inch by 6-inch smartphone screen.

Under Pennsylvania **[*21]** law, the elements of an enforceable contract are an "offer, acceptance, consideration, consideration or mutual meeting of the minds." **Schreiber v. Olan Mills**, 426 Pa. Super. 537, 627 A.2d 806, 808 (Pa. Super 1993) (citation

and quotation marks omitted). "[T]here must be a meeting of the minds; the very essence of an agreement is that the parties mutually assent to the same thing." ***Id.*** (some punctuation omitted). "Whether particular conduct expresses an offer and acceptance must be determined on the basis of what a reasonable person in the position of the parties would be led to understand by such conduct under all of the surrounding circumstances." ***Mountain Properties, Inc. v. Tyler Hill Realty Corp.***, 2001 PA Super 45, 767 A.2d 1096, 1101 (Pa. Super. 2001), *quoting* ***Temple University Hospital, Inc. v. Healthcare Management Alternatives, Inc.***, 2000 PA Super 387, 764 A.2d 587 (Pa. Super. 2000).

The United States Court of Appeals for the Ninth Circuit has recently described the two primary kinds of Internet contracts as follows:

> The[ ] elemental principles of contract formation apply with equal force to contracts formed online. Thus, if a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed.

> The most straightforward application of these principles in the online world involves so-called "clickwrap" agreements, **[\*22]** in which a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating "I agree" in order to proceed. In that scenario, the consumer has received notice of the terms being offered and, in the words of the Restatement, "knows or has reason to know that the other party may infer from his conduct that he assents" to those terms. Restatement (Second) of Contracts § 19(2). As a result, courts have routinely found clickwrap agreements enforceable.

> At the other end of the spectrum are so-called "browsewrap" agreements, in which a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website. Courts are more reluctant to enforce browsewrap agreements because consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms.

> To avoid the unfairness of enforcing contractual terms that consumers never intended to accept, courts confronted with online agreements such as those at issue here have devised rules to determine whether meaningful assent has been given. Unless **[\*23]** the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.

***Berman v. Freedom Fin. Network, LLC***, 30 F.4th 849, 855-56 (U.S. 9th Cir. 2022) (some citations omitted).[14] ***See also Nguyen v. Barnes & Noble Inc.***, 763 F.3d 1171, 1175-76 (9th Cir. 2014).

This leads us to the agreements at issue in this case.

### *Shannon Chilutti's 2016 Uber Account*

Shannon Chilutti registered for an Uber rider account in February 2016 *via* the company's website. R.R. 113a, 118a. The registration page requires the user to input certain personal information and click on a blue "Create Account" button at the bottom of the webpage. R.R. 113a-

---

[14] Although decisions of the Ninth Circuit Court of Appeals, "the federal district courts, and our sister states are not binding on this Court, they may provide persuasive authority," especially because there is limited case law on this issue. ***Century Indem. Co. v. OneBeacon Ins. Co.***, 2017 PA Super 328, 173 A.3d 784, 792 n. 14 (Pa. Super. 2017).

14a, 120a. Below the "Create Account" button, a putative user would have seen the following: "By clicking 'Create Account', you agree to Uber's Terms and Conditions and Privacy Policy." R.R. 120a. The words, "Terms and Conditions" and "Privacy Policy" were hyperlinks, which, **if clicked on**, would have redirected the user to another website that would then display a 12-page document. **[\*24]** R.R. 114a. The hyperlinks are smaller than the other wording on the webpage and in a blue-colored font that was not underlined. R.R. 114a, 207a-08a. Starting on the ninth page, the "Terms and Conditions" contain a "Dispute Resolution" Section, which provided the following provision:

Arbitration

You agree that any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Services (collectively, "*Disputes*") will be settled by binding arbitration between you and Uber, except that each party retains the right to bring an individual action in small claims court and the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents or other intellectual property rights. You acknowledge and agree that you and Uber are each waiving the right to a trial by jury or to participate as a plaintiff or class in any purported class action or representative proceeding. Further, unless both you and Uber otherwise agree in writing, the **[\*25]** arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of any class or representative proceeding. If this specific paragraph is held unenforceable, then the entirety of this "Dispute Resolution" section will be deemed void. Except as provided in the preceding sentence, this "Dispute Resolution" section will survive any

termination of these Terms. Arbitration Rules and Governing Law

Arbitration Rules and Governing Law

The arbitration will be administered by the American Arbitration Association ("AAA") in accordance with the Commercial Arbitration Rule and the Supplementary Procedures for Consumer Related Disputes (the "AAA Rules") then in effect, except as modified by this "Dispute Resolution" section. . . . The Federal Arbitration Act will govern the interpretation and enforcement of this Section. R.R. 130a-31a. Uber's legal program manager, Ryan R. Buoscio, admitted, during his deposition, that a purported user could create an account with Uber on its 2016 website without viewing the "Terms and Conditions" document.

R.R. 208a ("Depending on the device you're using . . . if you did not complete scrolling to the bottom of this page, it's possible you may have **[\*26]** not seen a component of the page."). Buoscio also acknowledged the website made no reference to the fact that the "Terms and Conditions" document contained an arbitration provision. *Id.* Lastly, he admitted that the terms, "arbitration," "waiver of jury trial," and "waiver of constitutional rights" do not appear anywhere on the general website. *Id.*

Shannon Chilutti averred in an affidavit that she did "not see any hyperlinks[,]" "click on any hyperlinks[,]" or "review" the "Terms and Conditions" or "Privacy Policy" during the registration process and she was not required to review them to complete the registration process. R.R. 222a.[15] During her deposition, Shannon Chilutti testified that she did not see any hyperlinks; rather, she only recalled clicking on the blue box to create the account. R.R. 231a-32a.

### Keith Chilutti's 2018 Uber Account

---

[15] She also indicated that she did not receive, open, or read a November 2016 email from Uber, in which it provided its users with its updated terms and conditions. R.R. 222a.

Keith Chilutti registered for an Uber rider account in September 2018 with the Uber Rider App on his IPhone. R.R. 167a, 169a. When registering, he provided personal information. R.R. 185a-86a, 189a-98a. Prior to his account being created, Keith viewed a screen, which stated, "By tapping the arrow below, you agree to Uber's Term of Use and acknowledge **[*27]** that you have read the Privacy Policy." R.R. 200a. Below, in smaller font, it stated: "To learn more, see our Terms of Use and Privacy Policy." *Id.* "Terms of Use" and "Privacy Policy" were blue-colored hyperlinks that were not underlined. R.R. 200a, 256a. To proceed with the process of registering, a user would not have to click on the links to proceed to the next screen. R.R. 258. The "Terms of Use" was a ten-page document that contained an "Arbitration Agreement" on the second page. The provision stated, in pertinent part:

> **By agreeing to the Terms, you agree that you are required to resolve any claim that you may have against Uber on an individual basis in arbitration, as set forth in this Arbitration Agreement. This will preclude you from bringing any class, collective, or representative action against Uber, and also preclude you from participating in or recovering relief under any current or future class, collective, consolidated, or representative action brought against Uber by someone else**.
> Agreement to Binding Arbitration Between You and Uber.
>
> You and Uber agree that any dispute, claim or controversy arising out of or relating to (a) these Terms or the existence, breach, termination, **[*28]** enforcement, interpretation or validity thereof, or (b) your access to or use of the Services at any time, whether before or after the date you agreed to the Terms, will be settled by binding arbitration between you and Uber, and not in a court of law.
> You acknowledge and agree that you and Uber

are each waiving the right to a trial by jury or to participate as a plaintiff or class member in any purported class action or representative proceeding. Unless both you and Uber otherwise agree in writing, any arbitration will be conducted only on an individual basis and not in a class, collective, consolidated, or representative proceeding. However, you and Uber each retain the right to bring an individual action in small claims court and the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents or other intellectual property rights.
Rules and Governing Law.

The arbitration will be administered by the American Arbitration Association ("AAA") in accordance with the AAA's Consumer Arbitration Rules and the Supplementary Procedures **[*29]** for Consumer Related Disputes (the "AAA Rules") then in effect, except as modified by this Arbitration Agreement. The AAA Rules are available at www.adr.org/arb_med or by calling the AAA at 1-800-778-7879. . . .

R.R. 172a-73a (emphasis in original).

At his deposition, Keith Chilutti testified that he did not click on either hyperlink during the registration process, so he never reviewed the documents. R.R. 266a-67a.

Based on the nature of the Uber's two interfaces, it is clear the contracts qualify as "browsewrap agreements" because both Appellants were "left unaware that contractual terms were even offered, much less that continued use of the website [would] be deemed to manifest acceptance of those terms." *Berman*, 30 F.4th at 856. Thus, we are faced with the question of whether: "(1) the website provide[d] reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer [took] some action, such as clicking a

button or checking a box, that unambiguously manifest[ed] his or her assent to those terms." *Id.*

In *Berman*, the Ninth Circuit addressed the issue of: "Under what circumstances can the use of a website bind a consumer to a set of hyperlinked 'terms and conditions' that the **[*30]** consumer never saw or read?" *Berman*, 30 F.4th at 853 (citation omitted). The case involved a defendant-digital marketing company "that generate[d] leads for its clients by collecting information about customers who visit[ed]" the company's websites. *Id.* The website offered "rewards like gift cards and free product samples as an enticement to get consumers to provide their contact information and answer survey questions." *Id.* The plaintiffs visited websites operated by the defendant that "contained a set of hyperlinked terms and conditions that included a mandatory arbitration provision[.]" *Id.* After the defendant received the information from the customers, it then used that data to conduct a telemarketing campaign on behalf of a debit relief company, placing "unsolicited telephone calls and text messages to hundreds of thousands of customers," including the plaintiffs. *Id.* at 854. Plaintiffs filed a putative class action on behalf of consumers who received these calls and texts, alleging the calls and texts were made without their consent and violated the Telephone Consumer Protection Act.[16] *Id.* The defendant moved to compel arbitration, arguing that "by clicking on the 'continue' buttons, [the plaintiffs] had agreed to the hyperlinked terms and conditions, **[*31]** including the mandatory arbitration provision." *Id.* The district court denied the motion, concluding "that the content and design of the webpages did not conspicuously indicate to users that, by clicking on the 'continue' button, they were agreeing to [the defendant's] terms and conditions." *Id.*

On appeal, the Ninth Circuit initially pointed out that the defendant did not argue in its motion to compel that the "plaintiffs had actual knowledge of

any agreement to arbitrate." *Berman*, 30 F.4th at 856. The Ninth Circuit then opined that the defendant "failed to show" that both "conditions necessary for finding an enforceable agreement based on inquiry notice were satisfied." *Id.* Regarding whether the website provided "reasonably conspicuous notice" of the terms to which the consumer will be bound, the Court opined:

> First, to be conspicuous in this context, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it. The text disclosing the existence of the terms and conditions on these websites is the antithesis of conspicuous. It is printed in a tiny gray font considerably smaller than the font used in the surrounding **[*32]** website elements, and indeed in a font so small that it is barely legible to the naked eye. The comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else. And the textual notice is further deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable critical text. Far from meeting the requirement that a webpage must take steps "to capture the user's attention and secure her assent," the design and content of these webpages draw the user's attention away from the most important part of the page.
>
> Website users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print. Because "online providers have complete control over the design of their websites," "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers[."] The designer of the webpages at issue here did not take that obligation to heart.

---

[16] *See* 47 U.S.C. § 227 *et seq.*

Second, while it is permissible to disclose terms and conditions through a hyperlink, the fact **[*33]** that a hyperlink is present must be readily apparent. Simply underscoring words or phrases, as in the webpages at issue here, will often be insufficient to alert a reasonably prudent user that a clickable link exists. Because our inquiry notice standard demands conspicuousness tailored to the reasonably prudent Internet user, not to the expert user, the design of the hyperlinks must put such a user on notice of their existence.

A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently "set apart" from the surrounding text. Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage. Consumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to "ferret out hyperlinks." The failure to clearly denote the hyperlinks here fails our conspicuousness test.

*Id.* at 856-67 (citations omitted).

In determining whether the plaintiffs took **[*34]** some action that unambiguously manifested their assent, the Court determined:

In using the websites, [the plaintiffs] did not take any action that unambiguously manifested their assent to be bound by the terms and conditions. [The defendant relies] on plaintiffs' act of clicking on the large green "continue" buttons as manifestation of their assent, but merely clicking on a button on a webpage, viewed in the abstract, does not signify a user's agreement to anything. A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement. The presence of "an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound" is critical to the enforceability of any browsewrap-type agreement.

The webpages here did provide advisals concerning the terms and conditions in proximity to the "continue" buttons. On the webpage [a plaintiff] visited, the notice appeared directly above the button, and on the webpage [the other plaintiff] visited it appeared above the button separated by several intervening lines of **[*35]** text. But "even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice."

Rather, the notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement. The notice did not do so here. Both webpages stated, "I understand and agree to the Terms & Conditions," but they did not indicate to the user what action would constitute assent to those terms and conditions. Likewise, the text of the button itself gave no indication that it would bind plaintiffs to a set of terms and conditions. This notice defect could easily have been remedied by including language such as, "By clicking the Continue >> button, you agree to the Terms & Conditions."

[The defendant asserts] that the presence of the phrase "which includes mandatory arbitration" in the textual notice distinguishes the webpages at issue here from those rejected by other courts. This argument is unavailing, as it fails to appreciate the key issue in this appeal. The question before us is not whether [the plaintiffs] may have been aware of the mandatory arbitration provision in particular, but rather **[*36]** whether they can be deemed to have manifested assent to any of the terms

and conditions in the first place. Because the textual notice was not conspicuous and did not explicitly inform [the plaintiffs] that by clicking on the "continue" button they would be bound by the terms and conditions, the presence of the words "which includes mandatory arbitration" in the notice is of no relevance to the outcome of this appeal.

*Berman*, 30 F.4th at 857-58 (citations omitted). The Court of Appeals then concluded the district court properly denied the motion to compel because "the design and content of the webpages [the plaintiffs] visited did not adequately call to their attention either the existence of the terms and conditions or the fact that, by clicking on the 'continue' button, they were agreeing to be bound by those terms[,]" and therefore, "an enforceable agreement to arbitrate was never formed." *Id.* at 858.

Turing to the present matter, we conclude that Uber's website and application did not provide reasonably conspicuous notice of the terms to which Appellants were bound. For example, in Shannon Chillutti's case, the "terms and conditions" agreement was encapsulated in tiny, blue font at the very bottom of a cluttered webpage. **[*37]** The relevant text was not underlined or capitalized. With respect to Keith Chillutti, he was on the fifth screen of the registration process, after he had already provided substantive personal information, when the "Terms and Conditions" page could be reviewed in small font that, again, was not underlined or capitalized. Like in *Berman*, "[t]he comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else. And the textual notice is further deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable critical text." *Berman*, 30 F.4th at 857.

Thus, the matter now turns on whether Appellants took any action that unambiguously manifested their assent to be bound by the terms and

conditions. We acknowledge that the two agreements at issue herein would arguably meet the standard recited by the *Berman* Court, which stated: "This notice defect could easily have been remedied by including language such as, 'By clicking the Continue >> button, you agree to the <u>Terms & Conditions</u>.'" *Berman*, 30 F.4th at 858 (citation omitted).[17] Here, the text did include language like "By clicking 'Create Account,' you agree to Uber's Terms and **[*38]** Conditions" and "By tapping the arrow below, you agree to Uber's Term of Use[.]" R.R. 120a, 200a.

However, as indicated above, because the constitutional right to a jury trial should be afforded the greatest protection under the courts of this Commonwealth, we conclude that the *Berman* standard is insufficient under Pennsylvania law, and a stricter burden of proof is necessary to demonstrate a party's unambiguous manifestation of assent to arbitration. This is accomplished by the following: (1) explicitly stating on the registration websites and application screens that a consumer is waiving a right to a jury trial when they agree to the company's "terms and conditions," and the registration process cannot be completed until the consumer is fully informed of that waiver; and (2) when the agreements are available for viewing after a user has clicked on the hyperlink, the waiver should not be hidden in the "terms and conditions" provision but should appear at the top of the first page in bold, capitalized text.

Indeed, as indicated in the record before us, Appellants did not click on or access the terms and conditions before their registration process was completed. These facts were **[*39]** admitted by the

---

[17] *See also Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79-80 (2d Cir. 2017) (stating that "[a] reasonable user would know that by clicking the registration button, he was agreeing to the terms and conditions accessible via the hyperlink, whether he clicked on the hyperlink or not" and concluding there was an enforceable contract, in which the text on the screen "expressly warned the user that by creating an Uber account, the user was agreeing to be bound by the linked terms.").

Uber representatives. Rather, the evidence merely shows that they created a user account for the ridesharing service.[18] Furthermore, we point out that the definition of arbitration is not contained in the agreement and there is no link to the definition. R.R 130a-31a; R.R. 171a-72a. Likewise, there is no explanation as to the difference between binding and non-binding arbitration in the agreement. *See id.* Notably, if a party wants to review the AAA Rules that govern the process, they are required to click on a second hyperlink to access that document. *See* R.R. 131a, R.R. 172a. Further, we believe that the term, "arbitration," is ambiguous in that there is nothing to explain its meaning and any non-lawyer subscriber could easily believe that arbitration is simply another step in the litigation process that does not involve relinquishing the constitutional right to a jury trial in its entirety. As such, Appellants were not informed in an explicit and upfront manner that they were giving up a constitutional right to seek damages through a jury trial proceeding.[19]

Finally, we note that if the issue before us on appeal was a confession of money judgment, this Court would have no qualms in finding **[\*40]** the circumstances require an opening or striking of said

---

[18] We recognize there was purportedly a third account created by Appellants, an "Uber Eats" account, which is for a food delivery service. *See* Appellant's Brief at 15-16. The account was apparently created by Appellants' daughter using Shannon Chillutti's smartphone. R.R. 236a. We need not reach a determination on this account based on the above-stated analysis.

[19] Furthermore, it should be noted that the agreements themselves are ambiguous as to what each party believes the terms mean. For example, the arbitration provision in the Shannon Chillutti agreement states it relates to "disputes" related to "THESE terms" regarding the breach of the use of the services. R.R. 130. However, this language could plainly be interpreted as limited to claims for payment for services rendered. Moreover, there is language in the terms and conditions for both contracts that carves out arbitration to allow either party to proceed in small claims court but does not explain the specifics of what circumstances would warrant that proceeding. R.R. 10, 172. Lastly, nowhere does it say in either agreement that a consumer is giving up a constitutional right to seek damages through a jury trial for injuries sustained by the negligent provision of services.

judgment based on the inconspicuous use of the provision in question. The same would apply to a criminal conviction where no colloquy was provided, or the defendant was not advised of his right to a jury trial. We see no reason why the same analysis should not be afforded herein where a constitutional right a jury trial in a civil action is "clicked away" without the benefit of any protections the law provides.

Accordingly, we hold that the trial court erred in granting Appellees' petition to compel arbitration, and Appellants demonstrated there was a lack of a valid agreement to arbitrate, and therefore, they are entitled to invoke their constitutional right to a jury trial.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

Judge Dubow joins the Opinion.

Judge Stabile files a Dissenting Opinion.

Judgment Entered.

Date: 10/12/2022

**Dissent by:** STABILE

## Dissent

DISSENTING OPINION BY STABILE, J.:

While I do not discount the concerns expressed by the Majority with regard to Internet contracts, I believe Appellants' appeal should be quashed as an appeal from a collateral order. Therefore, I respectfully dissent.

As the Majority observed, **[\*41]** the trial court granted Uber's petition to compel arbitration and stayed the proceedings with respect to the co-Appellees. In its Rule 1925(a) opinion, the trial court did not discuss the parties' arguments regarding the agreement to arbitrate (or lack thereof) or explain its basis for granting the motion

to compel arbitration. Rather, the court limited its discussion to the appealability of a motion to compel arbitration and concluded that its order is "not appealable at this time because the parties have not been forced 'out of court.'" Trial Court Opinion, 6/2/21, at 2 (citing *Maleski v. Mut. Fire, Marine & Inland Ins. Co.*, 534 Pa. 575, 633 A.2d 1143, 1145 (Pa. 1993)).

Initially, I note that "[a]n order compelling arbitration and staying court action is not final; rather, it is interlocutory because the parties are not forced 'out of court.'" *Maleski*, 633 A.2d at 1145 (citation omitted). As our Supreme Court stated in *Maleski*, "[T]here is no express statutory authority providing for an appeal from an interlocutory order in a case where arbitration is compelled[.]" *Id.* at 1146 (footnote omitted). Appellants nevertheless contend that we have jurisdiction to entertain this appeal as a collateral order pursuant to Pa.R.A.P. 313(b). As this Court has recognized:

> Under Pa.R.A.P. 313(b), a collateral order is an order that 1) is separable from and collateral to **[*42]** the main cause of action; 2) involves a right too important to be denied review; and 3) presents a question that, if review is postponed until final judgment in the case, the claim will be irreparably lost.

*In re Bridgeport Fire Litigation*, 2012 PA Super 165, 51 A.3d 224, 230 n.8 (Pa. Super. 2012) (citation omitted). All three prongs of the collateral order test must be satisfied for this Court to exercise jurisdiction over an otherwise non-final order. *Spanier v. Freeh*, 2014 PA Super 133, 95 A.3d 342, 345 (Pa. Super. 2014).

Here, while the first two prongs are arguably satisfied, I conclude that the third prong is not. In the event Appellants might not be satisfied with the results of their arbitration, they could seek review of the arbitrator's decision.

In this regard, I note that Uber's Terms of Use call for arbitration pursuant to the Federal Arbitration

Act ("FAA"), 9 U.S.C.A., § 1 *et seq.* Nevertheless, as the Court of Appeals for the Third Circuit acknowledged:

> Arbitration is fundamentally a creature of contract. The Supreme Court has stated: "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *AT & T Techs., Inc. v. Communications Workers*, 475 U.S. 643, 648-49, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (citation omitted). The Federal Arbitration Act makes written agreements to arbitrate "valid, irrevocable, and enforceable" on the same terms as other contracts. 9 U.S.C.A. § 2 (West 1970). There must be evidence sufficient to establish the parties' **[*43]** consent to arbitration. As a matter of contract, no party can be forced to arbitrate unless that party has entered into an agreement to do so. That agreement must be express and unequivocal.

*Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1512 (3d Cir. 1994), *aff'd*, 514 U.S. 938, 115 S.Ct., 1920, 131 L.Ed.2d 985 (1995) (some citations omitted). "An arbitrator's decision to assert jurisdiction over objection is, however, subject to a much broader and more rigorous judicial review than an arbitral decision on the merits. Because it is a question for the court to decide, it is subject to *de novo* judicial review." *Id.* (internal quotations omitted).

In affirming the Third Circuit's decision, the United States Supreme Court stated, "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable evidence' that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (alterations and citations omitted).

While Uber's Terms of Use call for arbitration pursuant to the FAA, this Court has determined that

"the FAA standards of review do not apply to a state trial court's review over an arbitration award created and enforced under the FAA." ***Trombetta v. Raymond James Financial Services, Inc.***, 2006 PA Super 229, 907 A.2d 550, 569 (Pa. Super. 2006).[1] Therefore, we look to the Pennsylvania arbitration laws.[2]

As this Court explained in ***Sage v. Greenspan***, 2000 PA Super 398, 765 A.2d 1139 (Pa. Super. 2000), *appeal den'd*, 566 Pa. 684, 784 A.2d 119 (Pa. 2001):

---

[1] In ***Trombetta***, the Court explained that, "[t]he language of FAA § 10 itself substantiates this conclusion. Section 10 explicitly states: '*the United States court in and for the district where in the award was made . . .*' may vacate an arbitration award when certain circumstances are present." ***Id.***, 907 A.2d at 568-69 (emphasis and ellipses in original). "We believe this phrase constitutes plain language stating that FAA § 10 *only applies to proceedings in United [*44] States district courts." Id*. at 569 (emphasis added). Because a review of the Complaint filed in this action reveals that Appellants as well as some Appellees are residents of or entities incorporated in Pennsylvania, there is no diversity of citizenship (or federal question) upon which jurisdiction in the district court could be based.

A recent United States Supreme Court decision confirms that review of an arbitral award in this case would be governed by state law. In ***Badgerow v. Walters***, 142 S.Ct. 1310, 212 L. Ed. 2d 355 (2022), the Court held that "Congress has not authorized a federal court to adjudicate a Section 9 or 10 application just because the contractual dispute it presents grew out of arbitrating different claims, turning on different law, that (save for the parties' agreement) could have been brought in federal court." ***Id.*** at 1318. Further, "[t]he statutory plan . . . makes Section 9 and 10 applications conform to the normal—and sensible—judicial division of labor: The applications go to state, rather than federal, courts when they raise claims between non-diverse parties involving state law. ***Id.*** at 1321.

[2] We note that Uber's arbitration provisions reference applicability of California law in the event the FAA rules are found not to apply. If Appellants should attempt to vacate an award of the arbitrator, and if it is determined that California law applies, the court could look to Cal. Code Civ. Proc. § 1286.2(a)(4), which provides for vacating an award in the event "arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." ***See Cable Connection, Inc. v. DIRECTV, Inc.***, 44 Cal. 4th 1334, 82 Cal. Rptr. 3d 229, 190 P.3d 586, 600 (Ca. 2008) ("The powers of an arbitrator derive from, and are limited by, the agreement to arbitrate. Awards in excess of those powers may, under section[] 1286.2 and 1286.6 be corrected or vacated by the court") (citations omitted).

Chapter 73 of the Pennsylvania Judicial Code governs statutory, common law and judicial arbitration. 42 Pa.C.S.A. §§ 7301-7362. Sections 7301-7320 of Subchapter A apply to statutory arbitration proceedings and are known collectively as the Pennsylvania Uniform Arbitration Act ("UAA"). Sections 7341 and 7342 of Subchapter B apply to common law arbitration proceedings. 42 Pa.C.S.A. §§ 7341-7342[.] Whether an arbitration agreement is subject to the UAA (Sections 7301-7320 of Subchapter A) or common law (Sections 7341-7342 of Subchapter B) arbitration principles depends on whether the agreement is in writing and expressly provides for arbitration under the UAA. 42 Pa.C.S.A. § 7302(a)[.] Absent an express statement in the arbitration agreement, or a subsequent agreement by the parties which calls for the application of the UAA statutory provisions in Subchapter A, an agreement to arbitrate is conclusively presumed to be at common law and subject to the provisions of Subchapter B.

***Id.*** at 1141 (citations omitted).[3] Because the arbitration provisions in Uber's Terms of Use make no reference to the UAA, the standards of review for common law arbitration should apply in the event of a challenge to an award of the FAA arbitrator.

In ***Sage***, we recognized that "[t]he standard of [*45] review for a common law arbitration is very limited." ***Id.*** at 1142. The award of an arbitrator "is binding and may not be vacated or modified unless it is clearly shown that a party was denied a hearing or that fraud, misconduct, corruption or other irregularity caused the rendition of an unjust, inequitable or unconscionable award." ***Id.*** (quoting ***Prudential Prop. & Cas. Ins. Co. v. Stein***, 453 Pa. Super. 227, 683 A.2d 683, 684 (Pa.

---

[3] Because Appellants' Uber registrations and the accident giving rise to Appellants' claim predated July 1, 2019, the effective date of the Revised Statutory Arbitration Act, 42 Pa.C.S.A. § 7321.1-31, the provisions of that Act are not implicated.

Super. 1996)). Because a party cannot be forced to arbitrate absent an agreement to do so, *see First Options, supra*, if a court determines there was no agreement to arbitrate, and that Appellants submitted to arbitration only because they were compelled to do so, we believe the court could properly vacate an award based on a finding that the resulting award was "unjust, inequitable or unconscionable." Therefore, postponing review until final judgment in this case will not result in irreparable loss of Appellants' claim as it can be reviewed in accordance with the applicable Pennsylvania arbitration statutes. Appellants have failed to demonstrate that postponing review until final judgment in the case will result in irreparable loss of their claim. Therefore, they have not satisfied the third prong of the collateral order test.

"Because there is no express statutory authority providing **[*46]** for an appeal from an interlocutory order in a case where arbitration is compelled," *Maleski*, 633 A.2d at 1146, and because Appellants cannot satisfy the third prong of the collateral order test, I would quash the appeal.

**End of Document**